Scott R. JENSEN, personally and as Speaker of the Wisconsin Assembly and Mary E. Panzer, personally and as Minority Leader of the Wisconsin Senate, Petitioners,

v.

WISCONSIN ELECTIONS BOARD, an independent agency of the State of Wisconsin, Jeralyn Wendelberger, its chairman, and each of its members in his or her official capacity, David Halbrooks, R.J. Johnson, John P. Savage, John C. Schober, Steven V. Ponto, Brenda Lewison, Christine Wiseman and Kevin J. Kennedy, its executive director, Respondents,

STATE SENATE MAJORITY LEADER CHARLES J. CHVALA, State Assembly Minority Leader Spencer Black, Intervenors-Respondents,

WISCONSIN EDUCATION ASSOCIATION COUNCIL, a voluntary association, Stan Johnson, its elected president, and several of its members, Tommie Lee Glenn, Paul Hambleton and Dianne Catlin Lang, Intervenors-Respondents.

Supreme Court

*No. 02–0057–OA. Oral Argument February 5, 2002.—Decided February 12, 2002.*

2002 WI 13

(Also reported in 639 N.W.2d 537.)

For the petitioners there was oral argument by *James R. Troupis* of *Michael, Best & Friedrich,* Madison.

For intervenors-respondents, Charles J. Chvala and Spencer Black, there was oral argument by *Michael P. May* of *Boardman, Suhr, Curry & Field, LLP,* Madison.

For intervenor-respondent, WEAC, there was oral argument by *Brady C. Williamson, Jr.,* of *LaFollette, Godfrey & Kahn,* Madison.

For the respondents the cause was argued by *Thomas J. Balistreri,* assistant attorney general.

¶ 1. PER CURIAM. This matter involves the decennial problem of legislative redistricting. On January 7, 2002, Assembly Speaker Scott R. Jensen and Senate Minority Leader Mary E. Panzer, representing Assembly and Senate Republicans, petitioned this court for leave to commence an original action on the issue of state legislative redistricting. Senate Majority Leader Charles J. Chvala and Assembly Minority Leader Spencer Black, representing Senate and Assembly Democrats, and the Wisconsin Education Association Council (WEAC), along with its president and several of its members, were each permitted to intervene on the initial jurisdictional question.

¶ 2. The petitioners ask this court to declare the existing legislative districts constitutionally invalid due to population shifts now documented by the 2000 census. They further ask that we enjoin the respondent Wisconsin Elections Board (Elections Board) from conducting the 2002 elections using the existing districts. Finally, claiming a legislative impasse, they ask this court to remap the state's Senate and Assembly districts in time for the rapidly approaching 2002 election cycle.

¶ 3. The intervenors argue against our assumption of original jurisdiction in this matter because a three-judge panel of the federal district court in Milwaukee has already taken jurisdiction over state legislative redistricting, has scheduled a trial, and is ready, willing, and, under present circumstances, better able to decide the state and federal questions presented by this case. The Elections Board, by a 4–3 margin, supports the petition for original jurisdiction (four Republican appointees in favor, two Democratic appointees and one court-appointee against).

¶ 4. This case raises important state and federal legal and political issues that go to the heart of our system of representative democracy.[1] In the absence of a timely legislative compromise, our participation in the resolution of these issues would ordinarily be highly appropriate. For the reasons that follow, however, we

[1] Although not specifically pleaded in the petition, redistricting litigation typically presents Fourteenth Amendment equal protection questions under *Baker v. Carr*, 369 U.S. 186 (1962), *Reynolds v. Sims*, 377 U.S. 533 (1964) and their prodigious progeny; state constitutional questions under the applicable provisions of the state charter (here, Wis. Const. art. I, § 1; art. IV, §§ 2–5); and questions under the Voting Rights Act, 42 U.S.C. § 1971 *et seq.* (2001).

decline to accept original jurisdiction in this matter, and therefore deny the petition without prejudice.

I

¶ 5.  It is an established constitutional principle in our federal system that congressional reapportionment and state legislative redistricting are primarily state, not federal, prerogatives.[2] *Growe v. Emison,* 507 U.S. 25, 34 (1993); *Chapman v. Meier,* 420 U.S. 1, 27 (1975); *Scott v. Germano,* 381 U.S. 407, 409 (1965). Although the federal and state courts have concurrent jurisdiction to decide the federal and state constitutional and statutory issues presented by redistricting litigation, the United States Constitution and principles of federalism and comity dictate that the states' role is primary:

> '[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751 (1975). Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it.

*Growe,* 507 U.S. at 34.

---

[2] The cases and the parties sometimes use the terms "reapportionment" and "redistricting" interchangeably, although there is a distinction. Reapportionment is the allocation of seats in a legislative body where the district boundaries do not change but the number of members per district does (*e.g.,* allocation of congressional seats among established districts, that is, the states); redistricting is the drawing of new political boundaries. This petition involves the latter.

¶ 6.   The Wisconsin Constitution sets forth standards for redistricting,[3] and commits to the state legislature the authority and responsibility of drawing State Senate and Assembly district boundaries:   "At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants." Wis. Const. art. IV, § 3.

¶ 7.   However, in the four decades since *Baker v. Carr,* 369 U.S. 186 (1962), and *Reynolds v. Sims,* 377 U.S. 533 (1964), the matter of redistricting in Wisconsin has been resolved by the legislature without court involvement *exactly once,* in 1972. The last time this court was involved in redistricting was 1964. *See State ex rel. Reynolds v. Zimmerman,* 22 Wis. 2d 544, 126 N.W.2d 551 (1964) *("Zimmerman I"); State ex rel. Reynolds v. Zimmerman,* 23 Wis. 2d 606, 128 N.W.2d 16 (1964) *("Zimmerman II").*

¶ 8.   In *Zimmerman I,* this court followed the United States Supreme Court's *Baker v. Carr* lead and overruled prior cases that precluded judicial review of redistricting statutes valid when enacted but allegedly invalid under the Wisconsin Constitution due to subsequent population shifts. *State ex rel. Reynolds,* 22 Wis. 2d at 562–63 *("Zimmerman I").* Noting that the earlier cases were based upon the "political question" nonjusticiability rationale of *Colegrove v. Green,* 328 U.S. 549 (1946), distinguished by *Baker v. Carr,* 369 U.S. at 208–09, 234, this court held that:

---

[3] *See generally* Wis. Const. art. I, § 1 (equal protection), and art. IV, §§ 2–5 (requiring compactness, contiguity and respect for municipal boundaries in the establishment of district lines; also prohibiting the division of an assembly district in the formation of a senate district).

> The citizens of this state can now obtain affirmative judicial relief from federal courts upon a showing that the voting power discriminations resulting from malapportionment deny them equal protection. Since a denial of voting rights deemed to be a denial of the general standards of equal protection of the law under the Fourteenth amendment would also be a denial of the specific standard of representation in direct ratio to population in art. IV [of the Wisconsin Constitution], *there is no reason for Wisconsin citizens to have to rely upon the federal courts for the indirect protection of their state constitutional rights.*

*State ex rel. Reynolds*, 22 Wis. 2d at 564 ("*Zimmerman I*") (emphasis added).

¶ 9. Notwithstanding *Zimmerman I*'s unequivocal assertion of this court's institutional interest in vindicating the state constitutional rights of Wisconsin citizens in redistricting matters, redistricting combatants have either sought or ended up in federal court following both the 1980 census and the 1990 census. *See Wisconsin State AFL-CIO v. Elections Board*, 543 F. Supp. 630 (E.D. Wis. 1982); *Prosser v. Elections Board*, 793 F. Supp. 859 (W.D. Wis. 1992). In 1982, this court granted a petition for leave to commence an original action in the matter of legislative redistricting, but its jurisdiction was brief and inconsequential: the case was promptly removed to federal court in Milwaukee and consolidated with a redistricting lawsuit already pending there. *Wisconsin State AFL-CIO*, 543 F. Supp. at 632–33; *State ex rel. Dreyfus v. Election Board,* No. 82–480–OA (Wis. S. Ct. 1982) (petition for original action granted).

¶ 10. Despite the reality that redistricting is now almost always resolved through litigation rather than legislation, we are moved to emphasize the obvious: redistricting remains an inherently political and legislative—not judicial—task. Courts called upon to perform redistricting are, of course, *judicially legislating,* that is, *writing* the law rather than *interpreting* it, which is not their usual—and usually not their proper—role.[4] Redistricting determines the political landscape for the ensuing decade and thus public policy for years beyond. The framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to make precisely these sorts of political and policy decisions, is preferable to any other.

¶ 11. But the requirement of a remedy for constitutional or Voting Rights Act violations stipulated or adjudicated in redistricting litigation has impelled the federal courts to take up seemingly permanent residency in what Justice Frankfurter warned was a "political thicket" that judges "ought not to enter." *Colegrove,* 328 U.S. at 556 (plurality opinion). It is not a comfortable place for any court, state or federal. *See* Jeffrey C. Kubin, Note, *The Case for Redistricting*

---

[4] James Madison, quoting Montesquieu in Federalist No. 47, warned that "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted . . . 'Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.*'" *The Federalist No. 47,* at 245 (Alexander Hamilton, James Madison and John Jay) (Oxford Press ed. 1948).

*Commissions,* 75 Tex. L. Rev. 837, 841 (1997) ("[w]hile straightforward in principle, the redistricting process is complicated by the political arena in which it operates and the judiciary's attempts to police this political arena.").[5] We read *Growe* as the United States Supreme Court's effort to put the state supreme courts back into the equation.

## II

¶ 12.    We are at this moment well into the first legislative session following the 2000 census enumeration, and not far (just three and a half months) from the official commencement of the next election season (nomination paper circulation begins June 1). Wis. Stat. § 10.72(2) (1999–2000). And yet, neither the Democratic-controlled State Senate nor the Republican-controlled State Assembly has submitted a legislative redistricting bill. Accordingly, were we to take this case, we would be in a position similar to that in which the three-judge federal panel in 1992 found itself:

> [W]e are not reviewing an enacted plan. An enacted plan would have the virtue of political legitimacy. We are comparing submitted plans with a view to picking the one (or devising our own) most consistent with judicial neutrality. Judges should not select a plan that seeks partisan advantage—that seeks to change the ground rules so that one party can do better than it would do under a plan drawn up by persons having no political agenda—even if they would not be entitled to invalidate an enacted plan that did so.

[5] "[J]udicial management of a process that is necessarily political" is troubling. *La Porte County Republican Cent. Comm. v. Board of Comm'rs,* 43 F.3d 1126, 1130 (7th Cir. 1994).

*Prosser,* 793 F. Supp. at 867.

¶ 13.  The situation this time around is complicated not just by the prospect of competing plans but competing courts. Apparently anticipating the gridlock that sometimes results where (as here) a politically split bicameral legislature approaches a politically sensitive task such as redistricting, or perhaps just making an early forum-choice decision, a group of Wisconsin citizens commenced a congressional reapportionment lawsuit in federal court over a year ago. *Arrington v. Elections Board,* No. 01–C-121 (E.D. Wis. filed 2001), now pending and well along in the United States District Court for the Eastern District of Wisconsin, has since been amended to include the issue of state legislative redistricting. The petitioners here are intervening parties in the federal litigation, as are the intervenors in this case, Senate Majority Leader Chvala and Assembly Minority Leader Black.

¶ 14.  A three-judge panel, established pursuant to 28 U.S.C. § 2284 (2000), has assumed jurisdiction over the federal case and established a schedule that contemplates discovery, pretrial submissions and separate trials on congressional reapportionment and state legislative redistricting. On February 4, 2002, the *Arrington* panel issued an order adopting a pretrial and trial schedule proposed by the parties in that action. The order establishes deadlines for depositions and written discovery, the filing of proposed maps and witness lists, trial briefs, pretrial motions and supporting briefs. The federal court has set the state legislative redistricting matter for trial on April 11–12, 2002, indicating that the trial will not be stayed unless the Wisconsin "legislature or any other Wisconsin authority" has adopted and implemented "redistricting plans for congressional districts and state legislative dis-

715

tricts." *Arrington v. Elections Board,* No. 01–C-121 (E.D. Wis. Jan. 29, 2002) (Status Conference).

¶ 15.  *Growe* requires federal courts "to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Growe,* 507 U.S. at 33. *Growe* also specifies that any redistricting plan judicially "enacted" by a state court (just like one enacted by a state legislature) would be entitled to presumptive full-faith-and-credit legal effect in federal court. *Id.* at 35–36.

■

¶ 16.  But the *Growe* rule is deference, not abstention. *Id.* at 37. A redistricting plan adopted by this court—like one adopted by the legislature—would be subject to collateral federal court review for compliance with federal law. *See e.g., Voinovich v. Quilter,* 507 U.S. 146 (1993) (federal courts are bound to respect the states' apportionment choices unless those choices contravene federal requirements); *Sexson v. Servaas,* 33 F.3d 799, 803 (7th Cir. 1994) (if state apportionment violates federal law, the federal interest trumps the state interest); *see also Holder v. Hall,* 512 U.S. 874 (1994); *Johnson v. De Grandy,* 512 U.S. 997 (1994); *Thompson v. Smith,* 52 F. Supp. 2d 1364 (M.D. Ala. 1999). Accepting original jurisdiction, then, would necessarily put this case and any redistricting map it would produce on a collision course with the case now pending before the federal three-judge panel. At the very least, the outcome here would be subject to later review in federal court. At best, such a scenario would delay and disrupt the 2002 election season, which is now almost upon us. At worst, it would throw the whole process into considerable doubt.

716

¶ 17. There is no question but that this matter warrants this court's original jurisdiction; any reapportionment or redistricting case is, by definition, publici juris, implicating the sovereign rights of the people of this state. *See Petition of Heil,* 230 Wis. 428, 443, 284 N.W. 42 (1939). The people of this state have a strong interest in a redistricting map drawn by an institution of state government—ideally and most properly, the legislature, secondarily, this court. *Growe* unequivocally reaffirmed that the principles of federalism and comity establish the institutions of state government—legislative and judicial—as primary in matters of reapportionment and redistricting. Had our jurisdiction been invoked earlier, the public interest might well have been served by our hearing and deciding this case. As it stands, it is not.

¶ 18. Accepting original jurisdiction would undermine principles of cooperative federalism[6] and federal-state comity and would result in an unjustifiable duplication of effort and expense, all incurred by the taxpayers of this state. It would also have the substantial potential of creating uncertainty rather than resolution of the critical legal and political issues that surround redistricting.[7] Under circumstances more fa-

---

[6] *See generally* G. Alan Tarr and Mary Cornelia Aldis Porter, *State Supreme Courts in State and Nation,* 13 (1988)("[a]lthough the legal principles governing the relationships between state supreme courts and federal courts emphasize hierarchy and—to a lesser extent—autonomy, in actuality these relationships are often characterized by reciprocity and interdependence.").

[7] We note that the intervenors have also raised the possibility of removal should this court accept this case. *See State ex rel. Dreyfus v. Elections Board,* No. 82–480–OA (Wis. S. Ct. 1982) (petition for original action granted). While we do not

717

vorable to an orderly and efficient resolution of the case, we would readily accept original jurisdiction in this matter and decide the important issues that it raises. Indeed, this court has taken original jurisdiction in cases concerning legislative redistricting on no fewer than five previous occasions. *See State ex rel. Dreyfus,* No. 82–480–OA; *State ex rel. Reynolds,* 22 Wis. 2d 544 (*"Zimmerman I"*); *State ex rel. Thompson v. Zimmerman,* 264 Wis. 644, 60 N.W.2d 416 (1953); *State ex rel. Bowman v. Dammann,* 209 Wis. 21, 243 N.W. 481 (1932); *State ex rel. Attorney General v. Cunningham,* 81 Wis. 440, 51 N.W. 724 (1892).

¶ 19. Simultaneous, separate efforts by the state and federal courts addressing the subject of legislative redistricting would engender conflict and uncertainty regarding the validity of the respective plans that the parallel litigation would produce. The risk that this would leave the state with no clear, authoritative map of legislative districts going into the upcoming election season is significant.

¶ 20. Even if the federal court were to stay its hand under *Growe* and wait for the outcome of this case, the likelihood of followup federal court review, and, therefore, continued uncertainty and delay remains. We have no established protocol for the adjudication of redistricting litigation in accordance with contemporary legal standards. A procedure would have to be devised and implemented, encompassing, at a minimum, deadlines for the development and submission of proposed plans, some form of factfinding (if not a full-scale trial), legal briefing, public hearing, and

speculate on either the likelihood or success of such a strategic maneuver, *see,* 28 U.S.C. § 1441 (2001), we note only that the prospect of removal increases the possibility for uncertainty and delay.

decision. We are obviously not a trial court; our current original jurisdiction procedures would have to be substantially modified in order to accommodate the requirements of this case. *See* Wis. S. Ct. IOP § II.B.3 (May 24, 1984).

¶ 21. All this takes *time,* and there is precious little of that left—certainly not enough for back-to-back state and federal plenary proceedings on a matter as complex and consequential as this. The Elections Board has established a deadline of May 14 by which it hopes to certify new Senate and Assembly districts. If (as seems likely) our decision in this case were to be subsequently challenged in federal court on federal grounds, the legality of the new district boundaries would remain in doubt for an additional, unknown period of time. This, needless to say, would have serious practical and political ramifications for the people of this state and their elected officials.

¶ 22. Accordingly, while we recognize and agree that the institutions of state government are primary in matters of redistricting, and federalism requires deference to state high courts for their resolution, the timing and circumstances here do not allow us to responsibly exercise original jurisdiction in a way that would do substantial justice in the case. This is not to say that the legislature cannot now undertake to give the people of this state their due, and timely deliver a plan of legislative redistricting. While this court must act *as a court,* and provide, in this as in any other case, all of the procedural protections that due process and the right to be heard require, the legislature, *as a legislature,* can act more rapidly and respond to the exigencies of the situation.

¶ 23. The legislature has it within its power, if not its present will, to draft a redistricting plan; we urge it

719

to summon the will and do so forthwith. Other state legislatures are currently acting on redistricting. Legislative action might not obviate federal court review, but it would have the virtue of putting in place a redistricting plan that carries political legitimacy. *See Prosser,* 793 F. Supp. at 867. The people of this state deserve no less.

## III

¶ 24.   Consistent with *Growe,* and to assure the availability of a forum in this court for future redistricting disputes, we will initiate rulemaking proceedings regarding procedures for original jurisdiction in redistricting cases. Components of a new procedure could include: provisions governing factfinding (by a commission or panel of special masters or otherwise); opportunity for public hearing and comment on proposed redistricting plans; established timetables for the factfinder, the public and the court to act; and if possible, measures by which to avoid the sort of federal-state court "forum shopping" conflict presented here. *See generally Growe,* 507 U.S. 25; *Wilson v. Eu,* 816 P.2d 1306, 1307 (Cal. 1991);[8] *In re Reapportionment Plan for Pennsylvania General Assembly,* 442 A.2d 661 (Pa. 1981); Pa. Const. Art. 2 § 17 (2001); *see also Teague v.*

___

[8] In California, for example, the following procedure has been followed:

• The supreme court appoints a panel of three special masters comprised of retired or reserve trial and appellate judges charged with the responsibility of holding a series of public hearings throughout the state to receive evidence and arguments on proposed redistricting plans.

• The special masters must complete the public hearings within 30 days of their appointment and submit recommendations and a proposed plan within 30 days thereafter. An addi-

*Bad River Band of Chippewa Indians,* 2000 WI 79, 236 Wis. 2d 384, 612 N.W. 709. Public and expert comment will be solicited, and a hearing on this issue shall be held on Monday, October 14, 2002, at 9:30 a.m. in the Supreme Court Room in the State Capitol, Madison, Wisconsin.

¶ 25.  We emphasize in closing that this court is the final arbiter of questions arising under the Wisconsin Constitution, and as such, stands ready to carry out its responsibility to faithfully adjudicate any such questions in appropriate circumstances, should that become necessary. *See State ex rel. Reynolds,* 22 Wis. 2d at 562–63 (*"Zimmerman I"*). For the foregoing reasons, the petition for leave to commence an original action is denied without prejudice.

tional 30–day period for briefing and for filing of public comments with the court concerning the special masters' plan is permitted.

• The court then reviews the special masters' plan and public comment.