# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP829 |
| COMPLETE TITLE: | Penny L. Springer, |
| |        Plaintiff-Appellant, |
| |    v. |
| | Nohl Electric Products Corporation, General Refractories Company, Dana Sealing Products, LLC, John Crane, Inc., Union Carbide Corporation, Rockbestos Surprenant Cable Corporation a/k/a Rockbestos Products Corp and RSCC Wire & Cable, Inc., Garlock Sealing Technologies LLC, Anchor Packing Company, Inc., Gaskets, Inc., Cincinnati Valve Company, Leslie Controls, Inc. and Trac Regulator Company, Inc., |
| |        Defendants, |
| | Powers Holdings, Inc. and Fire Brick Engineers Company, Inc., |
| |        Defendants-Respondents-Petitioners, |
| | Secure Horizons by United Health Care Insurance Company, |
| |        Subrogated Defendant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 370 Wis. 2d 787, 882 N.W.2d 870
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | May 15, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 2, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Jefferson |
|   JUDGE: | William F. Hue |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, J., dissents, joined by A.W. BRADLEY, J. (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-respondents-petitioners, there were briefs by *George S. Peek*, *Eric D. Carlson*, *Benjamin A. Sparks*,

and *Crivello Carlson*, *S.C.*, Milwaukee. There was an oral argument by *Eric D. Carlson*.

For the plaintiff-appellant, there was a brief by *Kathryn A. Keppel* and *Gimbel*, *Reilly*, *Guerin & Brown LLP*, Milwaukee, with whom on the brief was *Ronald G. Tays* and *Tays Law Office*, Milwaukee. There was an oral argument by *Ronald G. Tays*.

No. 2015AP829
(L.C. No. 2010CV622)

STATE OF WISCONSIN      :      IN SUPREME COURT

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

**Penny L. Springer,**

       **Plaintiff-Appellant,**

    **v.**

**Nohl Electric Products Corporation, General Refractories Company, Dana Sealing Products, LLC, John Crane, Inc., Union Carbide Corporation, Rockbestos Surprenant Cable Corporation a/k/a Rockbestos Products Corp and RSCC Wire & Cable, Inc., Garlock Sealing Technologies LLC, Anchor Packing Company, Inc., Gaskets, Inc., Cincinnati Valve Company, Leslie Controls, Inc. and Trac Regulator Company, Inc.,**

       **Defendants,**

**Powers Holdings, Inc. and Fire Brick Engineers Company, Inc.,**

       **Defendants-Respondents-Petitioners,**

**Secure Horizons by United Health Care Insurance Company,**

       **Subrogated Defendant.**

**FILED**

**MAY 15, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 DANIEL KELLY, J. When one company purchases the assets of another, our law normally does not make the former responsible for the latter's liabilities. There are exceptions to that rule, however, such as when the parties use the transaction to fraudulently escape responsibility for those liabilities. Notwithstanding the great age of this common-law exception to successor non-liability, we have had scant occasion to provide guidance on how to recognize such transactions. We take the opportunity to do so today.[1] Specifically, we conclude that the Wisconsin Uniform Fraudulent Transfer Act does not govern the "fraudulent transaction" exception to the rule of successor non-liability, and so we reverse the court of appeals.

## I. BACKGROUND

¶2 Penny Springer's husband died in 2007 from mesothelioma. She believes his exposure to asbestos-containing products during his employment between 1963 and 1969 contributed to his sickness and eventual death. She sued several companies, including Fire Brick Engineers Company, Inc. and Powers Holdings, Inc., alleging they were negligent in mining, merchandising, manufacturing, supplying, installing,

---

[1] This is a review of an unpublished decision of the court of appeals, Springer v. Nohl Elec. Prods. Corp., No. 2015AP829, unpublished slip op. (Wis. Ct. App. June 23, 2016) (per curiam).

distributing, or selling the asbestos products to which Mr. Springer was exposed.[2]

¶3   The complaint identified Powers Holdings, Inc. as the successor to Fire Brick Engineers Company, Inc.   But the relevant history of these companies actually goes back much further.   In the 1940s, Harry J. Schofield formed a company that came to be known as Fire Brick Engineers Company.   The business manufactured and distributed, inter alia, asbestos-containing refractory and foundry supplies.   Several successors to this company contained some variation of "Fire Brick Engineers" in their names, so we will refer to the original as "FBE1."   In 1983, a group of investors (including attorneys who had previously provided legal representation to FBE1) formed a company that would come to be known as Fire Brick Engineers Company, Inc. ("FBE2") for the purpose of acquiring FBE1's assets.   FBE2 accepted some, but not all, of FBE1's liabilities. Several years later, FBE2 merged with Curtis Industries, Inc., and adopted the name Powers Holdings, Inc.   Powers Holdings, Inc. currently does business under the name "Fire Brick Engineers Company," but to avoid confusion, we will refer to it only as "Powers."   And because FBE2 was merged into Curtis, and therefore no longer exists as a separate entity, our references to "Powers" will include FBE2 unless we indicate otherwise.

---

[2] Mrs. Springer filed her complaint on February 8, 2010, and an amended complaint four days later.   Unless the context requires otherwise, when we refer to the "complaint," we will be referring to the amended complaint.

¶4    The record does not reflect that either FBE2 or Powers has ever manufactured or distributed asbestos-containing products.    FBE2 acquired FBE1 via an asset purchase agreement (the "Agreement"), which is a common method of acquiring a business while limiting exposure to its liabilities.[3]    The Agreement provided that the only liabilities FBE2 would assume in the transaction would be a promissory note, trade accounts-payable, open inventory purchase orders, loans against certain life insurance policies, and FBE1's lease obligations with respect to two properties.    The Agreement disclaimed the assumption of any other liabilities:  "Buyer [FBE2] does not, by this Agreement or otherwise, assume or agree to pay or perform any other liabilities or obligations of Seller [FBE1] of any kind, whether or not related to the Subjects' Business, all of which liabilities and obligations remain the sole responsibility of Seller."

¶5    Therefore, Powers' answer to the complaint affirmatively asserted that Mrs. Springer had sued the wrong company:  "[T]he Plaintiff has brought an action against the wrong entity insofar as Powers Holdings, Inc. is not liable for the torts of its predecessor corporations based upon corporate

---

[3] The "rule of non-liability for asset acquisitions is frequently the reason why parties choose that option in acquiring a business, as opposed to a merger or stock acquisition, in which the predecessor's obligations and liabilities continue in the surviving entity." Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶23, 261 Wis. 2d 70, 661 N.W.2d 776 (internal marks and quoted source omitted).

successor liability defenses." Neither the original nor the amended complaint named FBE1 as a party. Nothing in the pleadings recognized that FBE2 had been created long after the period of time during which Mrs. Springer says her husband was exposed to asbestos products, or that Powers has never commercially dealt with asbestos-containing products. And the pleadings asserted no facts or legal theories by which FBE2 or Powers could be held responsible for FBE1's liabilities.

¶6 Powers eventually moved for summary judgment. It argued, in part, that "there is no basis to impose liability on Powers Holding, Inc. as a successor to Fire Brick Engineers Company [FBE1]." Mrs. Springer responded that Powers is liable to her as successor to FBE1 under the "mere continuation" and "de facto merger" exceptions to the successor non-liability rule. The circuit court suspended summary judgment proceedings so the parties could engage in further discovery. Powers then amended its motion, in response to which Mrs. Springer asserted, for the first time, that the "fraudulent transaction" exception to the successor non-liability rule should apply. The circuit court, the Honorable William F. Hue presiding, granted Powers' motion and dismissed FBE2 and Powers from the case.

¶7 Mrs. Springer appealed. Her primary argument was that undisputed evidence proved the Agreement between FBE1 and FBE2 had the purpose of fraudulently escaping liability for FBE1's obligations. She also argued that the circuit court erred in granting summary judgment because there was a genuine factual dispute as to whether the "mere continuation" and "de facto

5

merger" exceptions to the rule of successor non-liability applied to Powers. The court of appeals addressed only the "fraudulent transaction" exception. Although it noted that Mrs. Springer did not adequately explain how a court is supposed to determine whether there has been such a fraudulent transaction, it concluded that "the question of whether a transfer transaction was entered into fraudulently must be answered in the context of Wisconsin's Uniform Fraudulent Transfer Act [Wis. Stat. ch. 242]." Springer v. Nohl Elec. Prods. Corp., No. 2015AP829, unpublished slip op., ¶16 (Wis. Ct. App. June 23, 2016) (per curiam). So the court of appeals reversed and remanded the cause to the circuit court for a trial in which the jury would apply the "badges of fraud" contained in Wis. Stat. § 242.04 (2015-16)[4] to determine whether Powers should be held responsible for the liabilities of its predecessor company, FBE1.

¶8 We granted Powers' petition for review, and now reverse the court of appeals.

## II. STANDARD OF REVIEW

¶9 We review the disposition of a motion for summary judgment de novo, applying the same methodology the circuit courts apply. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987); Borek Cranberry Marsh, Inc. v. Jackson Cty., 2010 WI 95, ¶11, 328 Wis. 2d 613, 785 N.W.2d 615

---

[4] All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise specified.

6

("We review the grant of a motion for summary judgment de novo . . . .").

¶10 "The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated." Green Spring Farms, 136 Wis. 2d at 315. "In testing the sufficiency of a complaint, we take all facts pleaded by plaintiff[] and all inferences which can reasonably be derived from those facts as true." Id. at 317. And we liberally construe pleadings "with a view toward substantial justice to the parties." Id. (citing Wis. Stat. § 802.02(6)). "The complaint should be dismissed as legally insufficient only if it is quite clear that under no circumstances can plaintiff[] recover." Id.

¶11 Under the second step of this methodology, "[i]f a claim for relief has been stated, the inquiry then shifts to whether any factual issues exist." Id. at 315. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2); see also Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶11, 261 Wis. 2d 70, 661 N.W.2d 776 (citing and applying Wis. Stat. § 802.08(2)).

## III. DISCUSSION

¶12 The question before us is a narrow one, to wit, whether the Wisconsin Uniform Fraudulent Transfer Act governs

7

the "fraudulent transaction" exception to the rule of successor non-liability. After resolving that question, we will then determine whether further proceedings in this case are necessary.

## A. The Rule of Successor Non-Liability

¶13 In determining whether the fraudulent transaction exception to the rule of successor non-liability should apply in this case, the court of appeals relied on the Wisconsin Uniform Fraudulent Transfer Act (Wis. Stat. ch. 242 (the "WUFTA")) for the standard by which to identify fraud in the transfer of assets from FBE1 to FBE2. We hold today that the WUFTA does not control the analysis of the fraudulent transaction exception. Our opinion will first address the basic principles undergirding the rule of successor non-liability. Then, we will explain why the WUFTA does not control the disposition of this case.

### 1. The Basics of Successor Non-Liability

¶14 Our common law provides that "a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation." Fish v. Amsted Indus., Inc., 126 Wis. 2d 293, 298, 376 N.W.2d 820 (1985) (quoting Leannais v. Cincinnati, Inc., 565 F.2d 437, 439 (7th Cir. 1977)). In Wisconsin, this rule dates back to the late nineteenth century. See Wright v. Milwaukee & St. Paul Ry. Co., 25 Wis. 46, 52 (1869) (stating that a corporation does not "by selling a portion of its property, or even the whole of it, impose upon the purchaser any liability for its general debts").

8

¶15 There are very practical justifications for this rule. It "protect[s] a bona fide purchaser from liabilities caused by a predecessor corporation of which the bona fide purchaser was unaware at the time of acquisition." Columbia Propane, L.P., 261 Wis. 2d 70, ¶23 (quoting Eva M. Fromm, Allocating Environmental Liabilities in Acquisitions, 22 J. Corp. L. 429, 441 (1997)). Without such a rule, assets would become unmarketable:

> If the liabilities always went with the assets, it would be difficult to sell assets because the purchaser would not know what he was getting. He might be "buying" a lawsuit the expected cost of which exceeded the value of the asset purchased, yet it would be too late for him to back out of the sale or renegotiate the price.

Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1424 (7th Cir. 1993) (applying Illinois law). This is no less true in the context of products liability cases, such as this one. Here's why:

> [T]he successor corporation did not create the risk nor did it directly profit from the predecessor's sale of the defective product; it did not solicit the use of the defective product nor make any representations as to its safety; nor is it able to enhance the safety of a product that is already on the market[.]

Fish, 126 Wis. 2d at 307 (citing Bernard v. Kee Mfg. Co., 409 So. 2d 1047, 1050 (Fla. 1982); Domine v. Fulton Iron Works, 395 N.E.2d 19, 23 (Ill. App. Ct. 1979); Jones v. Johnson Mach. &

Press Co. of Elkhart, Ind., 320 N.W.2d 481, 484 (Neb. 1982); Ostrowski v. Hydra-Tool Corp., 479 A.2d 126, 127 (Vt. 1984)).[5]

¶16 But this rule of successor non-liability is not absolute; there are four well-recognized circumstances in which it does not apply:

> (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

Fish, 126 Wis. 2d at 298 (quoting Leannais, 565 F.2d at 439).

¶17 We are interested here in the fourth exception. Even though it is over a century old, it has received only sporadic attention. "There are few cases under the fraud exception, . . . partly because creditors prefer to cast these cases as suits to set aside a fraudulent conveyance." Chaveriat, 11 F.3d at 1425. The scarcity is particularly evident when the claim sounds in tort. See, e.g., Restatement (Third) of Torts: Products Liability § 12 cmt. e (Am. Law Inst. 1998) (stating that the fraudulent transfer exception "has rarely been used to impose successor liability for products

---

[5] The rule applies regardless of the legal form of the businesses involved: "[This] rule and its exceptions are applicable, irrespective of whether a prior organization was a corporation or a different form of business organization." Tift v. Forage King Indus., Inc., 108 Wis. 2d 72, 77, 322 N.W.2d 14 (1982).

liability claims"); Timothy J. Murphy, Comment, A Policy Analysis of a Successor Corporation's Liability for its Predecessor's Defective Products When the Successor Has Acquired the Predecessor's Assets for Cash, 71 Marq. L. Rev. 815, 819 (1988) (stating that "the fraudulent transaction exception is usually not successfully invoked by products liability plaintiffs").

¶18 We learn from the few available cases that the justification for the fraudulent transfer exception is that such transactions can leave aggrieved parties with no remedy:

> This is clearest in the case where after the sale of all its assets a corporate seller distributes the proceeds of the sale to the shareholders and dissolves. If the purchaser is not liable, the transaction will have externalized the costs of the seller's acts that gave rise to liability.

Chavariat, 11 F.3d at 1425; see also Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 266 (1st Cir. 1997) (applying Rhode Island law) ("But since a rigid nonassumption rule can be bent to evade valid claims, the successor liability doctrine was devised to safeguard disadvantaged creditors of a divesting corporation in four circumstances.").

¶19 The bare desire for a remedy, however, is an insufficient rationale for imposing liability on an entity that had no relationship with the culpable company until after the risk was created. Therefore, the mechanism by which liability transfers from the predecessor to the successor must reflect culpability: "To impose liability on the successor corporation [under the fraudulent transfer exception], the law in every

11

jurisdiction . . . requires a finding that the corporate transfer of assets 'is for the fraudulent purpose of escaping liability.'" Raytech Corp. v. White, 54 F.3d 187, 192 (3d Cir. 1995) (applying Oregon law) (quoting 15 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7122 at 232);[6] see also United States ex rel. Bunk v. Gov't Logistics N.V., 842 F.3d 261, 276 (4th Cir. 2016) ("The fraudulent transaction theory turns on the intention underlying the transfer of assets to [the successor], i.e., whether it was made with an actual intention to hinder, delay, or defraud creditors.") (applying Virginia law); Cashman v. Hitchcock, 293 F. 958, 962 (1st Cir. 1923) ("When a corporation receives in good faith the transfer of all the assets of another corporation, and pays the selling corporation full consideration therefor, the transfer is not fraudulent," unless there is "proof that it was made with the intention to defraud creditors, and the grantee had knowledge of such intention.").

¶20 To help us understand the circumstances that would be sufficient to engage the fraudulent transaction exception to the rule of successor non-liability, we turn to our common law experience with fraudulent conveyances.

---

[6] "Under Fletcher's articulation of the exception, transferring corporate assets for the purpose, or with the intention, of escaping liability is, by definition, a transfer of assets with fraudulent purpose." Raytech Corp. v. White, 54 F.3d 187, 192 (3d Cir. 1995).

### 2. Common-Law Fraudulent Conveyances

¶21 The law of fraudulent conveyances originated in England to protect against debtors' creative efforts to put assets beyond the reach of creditors:

> Until the seventeenth century, England had certain sanctuaries into which the King's writ could not enter.  A sanctuary was not merely the interior of a church, but certain precincts defined by custom or royal grant.  Debtors could take sanctuary in one of these precincts, live in relative comfort, and be immune from execution by their creditors.  It was thought that debtors usually removed themselves to one of these precincts only after selling their property to friends and relatives for a nominal sum with the tacit understanding that the debtors would reclaim their property after their creditors gave up or compromised their claims.

Douglas G. Baird & Thomas H. Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand. L. Rev. 829, 829 (1985).

¶22 In response to this perceived problem, Parliament adopted what has come to be known as the Statute of 13 Elizabeth in 1571, which voided any conveyance that a debtor "devised and contrived of malice, fraud, covin, collusion, or guile to the end purpose and intent to delay, hinder, or defraud creditors and others of their just and lawful actions."  See An Act Against Fraudulent Deeds, Gifts, and Alienations, 13 Eliz. c. 5,

§ 1 (1571) (translated into modern English).[7]   The eminent jurist, Lord Edward Coke, then set about identifying the methods by which a plaintiff might prove that the conveyance was made for a fraudulent purpose.  He listed some in the famous Twyne's Case:

> 1st. That this gift had the signs and marks of fraud, because the gift is general, without exception of his apparel, or any thing of necessity; for it is commonly said, quod dolus versatur in generalibus.[8]

> 2nd. The donor continued in possession, and used them as his own; and by reason thereof he traded and trafficked with others, and defrauded and deceived them.

---

[7] In the original English, the text said that a conveyance was void if a debtor "devysed & contryved of Malyce Fraude Covyne Collusion or Guyle, to Thend Purpose and Intent to delaye hynder or defraude Creditors and others of theyr juste and lawfull Actions."  An Acte agaynst fraudulent Deedes Gyftes Alienations, &c., 13 Eliz. c. 5, § 1 (1571).  "Covyne" (or "covin," as we now spell it) is "[a] secret conspiracy or agreement between two or more persons to injure or defraud another."  Black's Law Dictionary 446 (Bryan A. Garner, ed., 10th ed. 2014); see also The Oxford English Dictionary 1079 (John A. Simpson & Edmund S.C. Weiner eds., 2d ed. 1989) (identifying "covyne" as an alternative form of "covin").

Moreover, although the 1571 Parliament designed this statute to be penal in nature, the 1623 Parliament gave it a civil application.  Bruce A. Markell, Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital, 21 Ind. L. Rev. 469, 473 (1988) (citing 13 Eliz. c. 5, § 1 (1571) and 21 Jac. 1, c. 19, § 7 (1623)).

[8] "Dolosus versatur in generalibus" means "[a] person intending to deceive deals in general terms."  Henry Campbell Black, A Law Dictionary Containing Definitions of the Terms and Phrases of American and English Jurisprudence, Ancient and Modern 387 (2d ed. 1910).

3rd. It was made in secret, <u>et dona clandestina sunt semper suspiciosa</u>.[9]

4th. It was made pending the writ.

5th. Here was a trust between the parties, for the donor possessed all, and used them as his proper goods, and fraud is always apparelled and clad with a trust, and a trust is the cover of fraud.

6th. The deed contains, that the gift was made honestly, truly, and <u>bona fide</u>: <u>et clausulae inconsuet' semper inducunt suspicionem</u>.[10]

<u>Twyne's Case</u> (1607) 76 Eng. Rep. 809, 812-14; 3 Co. Rep. 80b, 80b-81a (Star Chamber) (footnotes omitted). The courts developed and refined the means of proving fraud over the ensuing centuries. <u>See generally</u> Robert J. Rosenberg, <u>Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware</u>, 125 U. Pa. L. Rev. 235, 248 n.33 (1976).

¶23 We adopted this ancient history as our own from the very beginning: "[T]he principles of the English statutes amending the common law and existing at the time of our Revolution, suitable to our condition and in harmony with our constitution and statutes, are a part of the common law of this country." <u>Harrigan v. Gilchrist</u>, 121 Wis. 127, 219, 99 N.W. 909 (1904); <u>accord</u> <u>Glinka v. Bank of Vt.</u> (In re Kelton Motors,

---

[9] "Dona clandestina sunt semper suspiciosa" means "[c]landestine gifts are always suspicious." Lorna Marie, <u>The Judges and Lawyers' Companion, Latin Maxims and Phrases</u> 107 (2018).

[10] "Clausulae inconsuetae semper inducunt suspicionem" means "[u]nusual clauses always excite suspicion." 1 Stewart Rapalje & Robert L. Lawrence, <u>A Dictionary of American and English Law</u> 217 (1888).

15

Inc.), 130 B.R. 170, 177-78 (Bankr. D. Vt. 1991) ("The Statute of 13 Elizabeth has since served as the model for common law and modern American fraudulent conveyance laws."). Indeed, at least one court has observed that this common law background is the basis for the fraudulent transfer exception to the rule against successor non-liability. Chaveriat, 11 F.3d at 1426 ("It has been suggested, indeed, that the fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances."). Consequently, we may find reasonable guidance from that body of law.

¶24 American courts have continued their English cousins' tradition of inquiring into the types of circumstances that may indicate a fraudulent intent behind an asset conveyance. One of the most common indicia of fraudulent intent is the inadequate consideration paid for the acquired assets. See, e.g., Welco Indus., Inc. v. Applied Cos., 617 N.E.2d 1129, 1134 (Ohio 1993) ("Indicia of fraud include inadequate consideration and lack of good faith."); Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 959 P.2d 1052, 1056 (Wash. 1998) (en banc) ("Adequate consideration for a transfer of assets between a buying and selling corporation is an important element when determining whether to impose successor liability.").

¶25 The unusual nature of business activities and arrangements surrounding a transaction have also assisted courts in identifying fraud. The Fourth Circuit Court of Appeals, in determining whether the fraudulent transaction exception applied, inquired into factors such as (1) "[i]nadequacy of

16

consideration," (2) "[t]ransactions that are different from the usual method of transacting business," (3) "[t]ransactions in anticipation of suit or execution," and (4) "[t]ransactions through which the debtor retains benefits." Bunk, 842 F.3d at 277. The Kansas Supreme Court, in Avery v. Safeway Cab, Transfer & Storage Co., concluded that transferring all assets to a new entity was a fraud because (1) "[t]here was not a formal sale of the assets . . . at a fixed price," because (2) "[n]o formal arrangements were made to care for the other debts of the [predecessor]," and because (3) "the negotiators deliberately disabled it from any possible further exercise of its corporate functions." 80 P.2d 1099, 1101 (Kan. 1938).

¶26 Long experience has taught us that these types of circumstances frequently accompany fraudulent transactions. However, as distillations of experience, they should not be understood as definitive, nor comprehensive. The purpose of the fraudulent transaction inquiry is to discover the actual intent of those who engineered the transfer of assets from the old company to the new——this is not a question of negligence or strict liability. The finder of fact must consider all circumstances tending to illuminate whether the transfer was entered into for the fraudulent purpose of escaping liability for the transferor's obligations.

3. The Wisconsin Uniform Fraudulent Transfer Act

¶27 The WUFTA exists independently from this common law history, and fulfills a purpose quite separate from that of the

17

fraudulent transaction exception to the rule of successor non-liability. The Act is an important, but limited, tool. Whereas the WUFTA is designed to assist creditors in collecting on claims that may be frustrated by recent asset transfers, the fraudulent transaction exception is a doctrine that prevents successor companies from avoiding obligations incurred by their predecessors. This difference in purpose is reflected in two of the Act's specifics. First, the statute of limitations for claims under the Act can be as short as one year after learning the asset was transferred. Wis. Stat. § 242.09; Wis. Stat. § 893.425. As such, the Act is incapable of ensuring that liability continues to reside in the proper entity, especially when the injuries are latent and discovered years after the corporation is known to have restructured. And second, the remedies available under the Act center on the fraudulently conveyed asset, rather than the successor company. The Act allows the creditor to avoid the transfer to the extent necessary to satisfy its claim (Wis. Stat. § 242.07(1)(a)), attach the asset in the hands of the transferee (§ 242.07(1)(b)), obtain an injunction or appointment of a receiver to prevent loss of the asset (§ 242.07(1)(c)), or levy execution on the asset or its proceeds in the hands of the transferee (§ 242.07(2)). So, whereas the Act focuses on recovering the asset or its value, the fraudulent transaction exception focuses on the business entity itself and its liability for its predecessor's obligations.

18

¶28 Because the WUFTA is asset-focused, it does not account for the legislative policies and priorities embodied in our business-related statutes.    It does not address the limitation of liability afforded to such business entities as corporations (Wis. Stat. ch. 180), and limited liability companies (Wis. Stat. ch. 183).    The fraudulent transaction exception to the rule of successor non-liability, on the other hand, developed as an organic response to corporate law.    See George W. Kuney, A Taxonomy and Evaluation of Successor Liability, 6 Fla. St. U. Bus. L. Rev. 9, 12 (2007) ("[S]uccessor liability law is a product of the rise of corporate law in the last half of the 19th century and early part of the 20th century.    In fact, it appears to have developed because of, and in reaction to, the rise of corporate law.").

¶29 We agree with the United States Supreme Court's observation that "the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that '[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.'"    United States v. Bestfoods, 524 U.S. 51, 63 (1998) (quoting United States v. Texas, 507 U.S. 529, 534 (1993)).    Therefore, we conclude that chapter 242 has not supplanted the common-law fraudulent transaction exception to the rule of successor non-liability.

## B.  Dismissal of Powers

¶30 We must now determine whether there is anything left for the court of appeals or circuit court to resolve with

19

respect to Powers. The court of appeals said that "[Mrs.] Springer filed the present action against the respondents, seeking to hold them liable under the theory of successor liability for damages stemming from the death of Springer's husband." Springer, No. 2015AP829, unpublished slip op., ¶1. That is certainly what Mrs. Springer argued in the court of appeals, but it does not describe the case she pursued in the circuit court. What Mrs. Springer actually did in the circuit court was "alleg[e] that the respondents are liable under theories of negligence and strict liability." Id., ¶4. Because she pled the latter and not the former, Powers was properly dismissed from the case upon its motion for summary judgment.

¶31 Sometime between the joining of issue in this case and resolution of the motion for summary judgment, the nature of Mrs. Springer's claim against Powers changed substantially. The issue the parties joined was whether Powers culpably engaged in activity that resulted in Mr. Springer's exposure to asbestos. By the time Powers moved for summary judgment, however, it had become apparent that this claim could not succeed because FBE2 had not come into existence until many years after the period of Mr. Springer's alleged exposure, and Powers had never engaged in commerce with asbestos-containing products.[11]

---

[11] Our review of the record confirms that it contains no evidence that FBE2 or Powers had ever engaged in commerce with asbestos-containing products.

¶32 Consequently, in response to the motion for summary judgment, Mrs. Springer introduced an entirely new reason for holding Powers liable. She tacitly acknowledged that the relevant timeline made it impossible for FBE2 or Powers to have been part of the causal chain between the asbestos-containing products and her husband's death. So she instead argued Powers should be liable to her because (1) FBE1 had transferred all of its assets to Powers with the fraudulent purpose of escaping any future asbestos-related liability, (2) Powers was a mere continuation of FBE1, or (3) Powers was the product of a de facto merger with FBE1.

¶33 However, Mrs. Springer never made a claim out of any of these arguments; they were never more than a response to Powers' motion for summary judgment. Her pleadings never mentioned FBE1, either explicitly or implicitly. In neither her original nor her amended complaint are there allegations from which one could infer that she sought to hold Powers responsible for FBE1's torts. She certainly had opportunity and reason to amend her complaint to make such allegations——Powers' answer put her on notice that she had named the wrong company: "[T]he Plaintiff has brought an action against the wrong entity insofar as Powers Holdings, Inc. is not liable for the torts of its predecessor corporations based upon corporate successor liability defenses."

¶34 We review the disposition of a motion for summary judgment using the same methodology as the circuit court in the first instance. Green Spring Farms, 136 Wis. 2d at 315. We

21

begin by "examin[ing] the pleadings to determine whether a claim for relief has been stated." Id. When Powers filed its motion, it was seeking judgment on Mrs. Springer's claim that it was causally responsible for her husband's exposure to asbestos. We will assume, without deciding, that Mrs. Springer adequately alleged that Powers was in the causal chain of events that led to her husband's death, and pled the necessary elements of negligence and strict product liability. The next step requires us to review "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether we can conclude "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2). Summary judgment for FBE2 and Powers was appropriate because the record shows the parties do not dispute that FBE2 and Powers could not have been in the causal chain of events inasmuch as FBE2 did not exist until after Mr. Springer's alleged exposure to asbestos, and Powers has never bought or sold asbestos-containing products.

¶35 That leaves the question of whether Mrs. Springer has a viable claim against Powers based on successor liability. This inquiry requires that we return to an examination of the pleadings in search of allegations adequate to make out a claim of successor liability against FBE2 and Powers. To state a claim upon which relief may be granted, the plaintiff's allegations must be informed by the theory of liability: "In sum, Twombly makes clear the sufficiency of a complaint depends

22

on substantive law that underlies the claim made because it is the substantive law that drives what facts must be pled. Plaintiffs must allege facts that plausibly suggest they are entitled to relief." Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶31, 356 Wis. 2d 665, 849 N.W.2d 693.

¶36 A claim that a company is liable for the torts of a predecessor company is not the same as a claim of liability for the torts themselves. Tort claims comprise the familiar elements of duty, breach, causation, and damage. A claim that a successor company bears responsibility for the torts of its predecessor is entirely different. As a separate legal entity, Powers enjoys the presumption that it is not liable for the misdeeds of its predecessor, even when it has succeeded to all of its assets. See Fish, 126 Wis. 2d at 298 ("[A] corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation." (quoting Leannais, 565 F.2d at 439)); Wright, 25 Wis. at 52 (stating that a corporation does not "by selling a portion of its property, or even the whole of it, impose upon the purchaser any liability for its general debts").

¶37 A claim of successor liability, as distinct from a claim based on the underlying tort, puts on the plaintiff the burden of establishing one of the exceptions to the rule of non-

23

liability.[12]  Because the substantive theory of liability drives the facts a plaintiff must plead, see Data Key Partners, 356 Wis. 2d 665, ¶31, Mrs. Springer had the burden of alleging facts sufficient to reveal that she was pursuing Powers not as the tortfeasor itself, but as the successor to the tortfeasor. Exceptions to the rule of successor non-liability focus almost exclusively on the nature of the transaction by which the latter obtained the former's assets.  They have little to no relationship with the facts supporting the tortfeasor's liability.  Consequently, facts that are sufficient to support a claim against the tortfeasor are unlikely to be sufficient to support a claim of successor liability.[13]

---

[12] State v. Big John, 146 Wis. 2d 741, 756, 432 N.W.2d 576 (1988) ("[O]ne who relies on an exception to a general rule or statute has the burden of proving that the case falls within the exception."); see also Call Center Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp., 635 F.3d 48, 52 (2d Cir. 2011) ("Because the 'general rule' is that a purchaser of assets does not assume the predecessor's liability, it follows that the proponent of successor liability must offer proof that one of the aforementioned exceptions to the general rule applies."); Dayton v. Peck, Stow and Wilcox Co. (Pexto), 739 F.2d 690, 692 (1st Cir. 1984) (stating that the proponent of successor liability has the burden of proof regarding facts bringing defendants within one of the exceptions to successor non-liability).

[13] In Pennison v. Chicago, Milwaukee & St. Paul Railway Co., a successor liability case, we concluded the complaint failed to state a claim against the successor because its allegations did not make out a claim of successor liability. See 93 Wis. 344, 346-347, 67 N.W. 702 (1896).  We noted:  "The remedy of the plaintiff, if any, is against the Milwaukee & Northern Railroad Company.  Upon the allegations of the complaint, he has none against the defendant company [the successor]."  Id. at 347.

¶38 That is the case here. Mrs. Springer says she did not know about the existence of FBE1 until after Powers had moved for summary judgment. We are not persuaded this should make any difference to our conclusion. Powers' answer put Mrs. Springer on notice that FBE2 and Powers were not the tortfeasors she claimed they were. And there was a nearly two-year hiatus between the original and amended motions for summary judgment——the specific purpose of which was to allow for additional discovery into Powers' corporate history. Mrs. Springer had ample opportunity to amend her complaint to assert that the circumstances under which Powers succeeded to FBE1's assets were such that they should make Powers liable pursuant to one of the exceptions to the rule of successor non-liability. The complaint does not mention successor liability at all (except cryptically as between FBE2 and Powers, which is not at issue here). Nor does it even acknowledge the existence of FBE1. It necessarily follows that the complaint alleges nothing with respect to the asset transfer between FBE1 and its successors, the very thing that could potentially make Powers liable. So Mrs. Springer's pleadings are silent on the only theory of liability she now advances in her case.

¶39 Therefore, her complaint fails to "allege facts that plausibly suggest [she is] entitled to relief" as against Powers. See Data Key Partners, 356 Wis. 2d 665, ¶31. Accordingly, we need not address the second step of the summary judgment methodology. See Green Spring Farms, 136 Wis. 2d at 318 (noting that because a viable claim had not been stated,

25

"we need not proceed to the next step of the summary judgment methodology under section 802.08(2), Stats."). Powers was entitled to summary judgment.

¶40 The dissent believes it is improper for us to address whether Mrs. Springer adequately pled a claim of successor liability against Powers. It worries that we raised this sua sponte, without giving the parties an opportunity to address the issue. It says we "reached beyond the issues presented to [the court] to decide issues not presented or addressed by the parties," and in doing so, surprised the parties as well as the bench and bar. Dissent, ¶50. These are, conceptually, legitimate concerns, and the court must always be careful not to gratuitously address issues unnecessary to the resolution of the matter before us. But that is not the case here.

¶41 As explained above, we are reviewing the disposition of a motion for summary judgment. The bench and bar are aware that in conducting such a review, the methodology we use here is exactly what the circuit court uses. And the first step in that methodology is "to examine the pleadings to determine whether a claim for relief has been stated." Green Spring Farms, 136 Wis. 2d at 315. The parties assist the court in making that determination, but they cannot confine the court's analysis to the arguments they choose to make. See Saenz v. Murphy, 162 Wis. 2d 54, 57 n.2, 469 N.W.2d 611 (1991) ("[T]his court is not bound by the issues as they are framed by the parties."), overruled on other grounds by State ex rel. Anderson-El v. Cooke, 2010 WI 40, ¶¶28-31, 234 Wis. 2d 626, 610 N.W.2d 821. If

26

the plaintiff's pleading is deficient as a matter of law, the court may not pretend otherwise simply because the parties failed to say so. Naturally, the court must be quite certain of its footing when it makes a conclusion of law in such circumstances. But when the deficiency is manifest, the court must not shirk its duty. Here, not only is the deficiency manifest, it was conceded. During oral arguments before this court, counsel for Mrs. Springer acknowledged that "we did not plead a common law fraud claim" against Powers. Our decision should surprise no one.

## IV. CONCLUSION

¶42 The Wisconsin Uniform Fraudulent Transfer Act does not apply to the "fraudulent transaction" exception to the rule of successor non-liability. Because we conclude that FBE2 and Powers were entitled to summary judgment, there is no need for a remand. The court of appeals is reversed.

*By the Court.*—The decision of the court of appeals is reversed.

¶43 SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I write separately to make two points.

¶44 First, the majority confusingly muddles what does and does not constitute indicia of fraud for purposes of the fraudulent transfer exception to the general rule against successor liability. I conclude that courts may consult the badges of fraud listed in the Wisconsin Uniform Fraudulent Transfer Act (WUFTA) as indicative of a fraudulent transfer. The unique facts of each case inform the court's search for objective manifestations of fraud.

¶45 Second, unlike the majority, I would not dismiss Springer's amended complaint. Neither Fire Brick Engineers Company, Inc. nor Powers Holding, Inc. (collectively "defendants") has ever challenged the sufficiency of Springer's amended complaint on the issue of successor liability. Neither the circuit court nor the court of appeals addressed the sufficiency of Springer's amended complaint on the issue of successor liability.

¶46 The majority sua sponte raises and decides this issue without affording Springer an opportunity to address the issue or seek leave to amend her complaint.

¶47 The majority justifies its summary dismissal of Springer's amended complaint by stating that Springer "had opportunity and reason to amend her complaint" to allege successor liability. Majority op., ¶33.

¶48 Springer's adversaries, however, never claimed that the pleadings were deficient after being put on notice in

1

Springer's opposition to the defendants' motion for summary judgment that she was pursuing a theory of successor liability. Springer did not move to amend her complaint because there was no adversarial challenge to the sufficiency of her pleadings after the defendants were put on notice of her theory of successor liability. If the defendants believed that Springer had not adequately pleaded her theory of successor liability, they could have so argued. They did not.

¶49 The issues of whether Springer's complaint adequately pleads successor liability, and if not, whether Springer should be granted leave to amend her complaint, are not issues properly before this court. The parties should be given notice the court is concerned about these issues and should be given an opportunity to address these issues.

¶50 The court has once again reached beyond the issues presented to it to decide issues not presented or addressed by the parties. The majority, again, surprises the parties, the bench, and the bar.

¶51 The frequency and cavalier attitude with which this court surprisingly decides an issue without providing parties notice of the issue or an opportunity to address the issue is troubling. Due process requires (at a minimum) notice and an opportunity to be heard. Schroeder v. City of New York, 371 U.S. 208, 212 (1962); State v. Nelson, 2014 WI 70, ¶19, 355 Wis. 2d 722, 849 N.W.2d 317; Jensen v. Wis. Elections Bd., 2002 WI 13, ¶22, 249 Wis. 2d 706, 639 N.W.2d 537.

2

¶52 For cases decided this term that illustrate the court's growing bad habit of addressing issues without giving parties notice and the opportunity to address the issue (in violation of due process), see Manitowoc Company, Inc. v. Lanning, 2018 WI 6, 379 Wis. 2d 189, 906 N.W.2d 130 (overruling Heyde Cos., Inc. v. Dove Healthcare, LLC, 2002 WI 131, 258 Wis. 2d 28, 654 N.W.2d 830, without providing parties notice or opportunity to brief the issue of Heyde's continuing validity and when doing so was unnecessary to the court's resolution of the case); Sands v. Menard, 2017 WI 110, 379 Wis. 2d 1, 904 N.W.2d 789 (dismissing unjust enrichment claim for being inadequately pleaded despite the pleading issue never being raised at any point during litigation).[1]

---

[1] In contrast with the cases described above in which the court decides issues not addressed or argued by the parties, State v. Reyes Fuerte, 2017 WI 104, 378 Wis. 2d 504, 904 N.W.2d 773, is an example of the court and the parties essentially ignoring the issue presented and discussed in the petition for review that induced the court to grant the petition and addressing a new, different issue the parties present.

In Reyes Fuerte, the petition for review phrased the issue presented as follows:

> Now that criminal defense attorneys are obligated to advise their clients about the immigration consequences of their pleas, Padilla v. Kentucky, 559 U.S. 356 (2010), should the Wisconsin Supreme Court overturn its decision in State v. Douangmala, 2002 WI 62, 253 Wis. 2d 173, 646 N.W.2d 1, and reinstate the harmless error rule to prohibit a defendant who was aware of the potential immigration consequences of his plea from being able to withdraw the plea just because the circuit court failed to give a statutory immigration warning that complied with Wis. Stat. § 971.08(1)(c)?

(continued)

¶53 I am concerned that this court's erosion of due process rights will continue unabated until the people of this state are left with nothing but a faint shadow of what once was a constitutionally protected right.

¶54 I dissent.

¶55 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

---

Given the articulation of the issue presented for review in Reyes Fuerte, one might expect that an analysis of Padilla would be front and center in the briefs filed in this court. It is not. Padilla did not drive the parties' analyses.

The court errs when it allows and condones parties' phrasing an issue one way in the petition for review (thus inducing the court to grant the petition) and then fundamentally changing the issue presented when the case is actually being litigated and argued in this court. This practice allows the parties and the court to violate court rules and is unfair to litigants who attempt to follow the rules the court has adopted.

United States Supreme Court Justice Antonin Scalia (joined by Justice Elena Kagan) made this point as follows:

I would not encourage future litigants to seek review premised on arguments they never plan to press, secure in the knowledge that once they find a toehold on this Court's docket, we will consider whatever workaday arguments they choose to present in their merits briefs.

City & Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1779 (2015) (Scalia, J., concurring in part, dissenting in part).

4