# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP822 |

| | |
|---|---|
| COMPLETE TITLE: | Veritas Steel, LLC,<br>            Plaintiff-Respondent,<br>      v.<br>Lunda Construction Company,<br>            Defendant-Third-Party<br>            Plaintiff-Appellant-Petitioner,<br>      v.<br>Bridge Resources, LLC n/k/a Bridge Fabrication Holdings,<br>LLC, Alan Sobel, Matthew Cahill and Atlas Holdings, LLC,<br>            Third-Party Defendants-Respondents. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 385 Wis. 2d 210,923 N.W.2d 181
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | January 15, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 19, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Frank D. Remington |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ZIEGLER, REBECCA GRASSL BRADLEY, KELLY and HAGEDORN, JJ., joined. ROGGENSACK, C.J., filed a concurring opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-third-party-plaintiff-appellant-petitioner, there were briefs filed by *Saul C. Glazer, Michael D. Hahn,* and *Axley Brynelson*, Madison. With whom on the brief was *Dean Thomson, Paul Ratelle,* and *Fabyanske Westra Hart & Thomson*

*PA,* Minneapolis, Minnesota. There was an oral argument by *Paul Ratelle*.

For the third-party-defendants-respondents, there was a brief filed by *Michael D. Leffel, Kevin M. LeRoy, Thomas L. Shriner, Jr.* and *Foley & Lardener LLP,* Madison and Milwaukee. With whom on the brief was *Richard Mancino, Jill K. Grant, Stuart R. Lombardi, William O'Brien, Patricia O. Haynes, Joseph G. Davis,* and *Willkie Farr & Gallagher LLP*, New York, New York and Washington, DC. There was an oral argument by *Richard Macino*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP822
(L.C. No. 2015CV509)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Veritas Steel, LLC,**

        **Plaintiff-Respondent,**

   **v.**

**Lunda Construction Company,**

        **Defendant-Third-Party**
        **Plaintiff-Appellant-Petitioner,**

   **v.**

**Bridge Resources, LLC n/k/a Bridge Fabrication Holdings, LLC, Alan Sobel, Matthew Cahill and Atlas Holdings, LLC,**

        **Third-Party Defendants-Respondents.**

**FILED**

**JAN 15, 2020**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, ZIEGLER, REBECCA GRASSL BRADLEY, KELLY and HAGEDORN, JJ., joined. ROGGENSACK, C.J., filed a concurring opinion.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA FRANK DALLET, J. Lunda Construction Company (Lunda) alleges that Veritas Steel, LLC (Veritas), and third-party defendants Atlas Holdings, LLC (Atlas), and Bridge Fabrication

Holdings, LLC, took unfair advantage of PDM Bridge, LLC's (PDM) loan defaults, "with the intent to gain ownership of PDM's lucrative steel fabrication business for grossly inadequate consideration through a secretive, unlawful and fraudulent process designed to render PDM an empty shell with no assets remaining to satisfy PDM's eight-figure liability to Lunda."

¶2  The circuit court granted summary judgment to Veritas on Lunda's successor liability claim because there was no genuine issue of material fact as to the de facto merger, mere continuation, and fraudulent transaction exceptions to the general rule against successor liability.[1]  The court of appeals affirmed as to the de facto merger and mere continuation exceptions, the only exceptions Lunda raised on appeal.[2]

¶3  The question before us is whether the de facto merger, mere continuation, and fraudulent transaction exceptions to the rule against successor liability apply in this case to impose successor liability on Veritas.  Lunda asks this court to read Fish v. Amsted Indus., Inc., 126 Wis. 2d 293, 376 N.W.2d 820 (1985), as having expanded the de facto merger and mere continuation exceptions.  Lunda further asserts that the court of appeals erroneously dismissed its successor liability claim in light of the fraudulent transaction exception.

---

[1] Judge Frank D. Remington of Dane County Circuit Court presided.

[2] Veritas Steel, LLC v. Lunda Construction Co., No. 2017AP822, unpublished slip op. (Wis. Ct. App. Nov. 21, 2018).

2

¶4 We reject Lunda's expanded reading of Fish, 126 Wis. 2d 293, and conclude that Lunda has not raised a genuine issue of material fact as to an "identity of ownership" between Veritas and PDM, the key component necessary to satisfy the de facto merger and mere continuation exceptions. We further conclude that by not raising the fraudulent transaction exception before the court of appeals, Lunda forfeited that argument. We therefore affirm the court of appeals.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶5 The facts of this case are lengthy and fairly complex. PDM operated a steel fabrication business.[3] In 2006, PDM entered into a credit agreement with a syndicate of lenders for a $115 million term and $25 million revolving loan. As security for repayment, the lenders obtained a first priority lien on "substantially all of PDM's assets."

¶6 PDM's financial condition had begun to significantly decline by 2011. PDM eventually defaulted on its obligations to the lenders under the 2006 credit agreement. By 2013, PDM was indebted to the lenders on secured debt with a face value of approximately $76 million. In June 2013, the lenders and PDM executed a forbearance agreement in which PDM agreed to either sell itself to an interested acquirer or restructure with the assistance of an investment banker.

---

[3] American Securities, a private equity firm, purchased PDM in 2006 and held it through a company called ASP PDM LLC. Like the court of appeals, for ease of reference, we will use "PDM" to refer both to the limited liability corporation and its only member. See Veritas, No. 2017AP822, ¶6 n.2.

¶7 Pursuant to the forbearance agreement, PDM retained an investment banker to market a sale of the company for the highest possible price. Of 136 potential acquirers contacted by the investment banker, none of them offered a price that came close to satisfying PDM's outstanding secured debt. The highest bid came from Atlas, a private equity firm.

¶8 Rather than purchase PDM's assets directly, Atlas and the lenders agreed that Atlas would acquire the lenders' secured claims against PDM and then foreclose on PDM's assets. Atlas caused the creation of a new entity, Bridge Resources, LLC, to aid in the acquisition of PDM's assets. Bridge Resources subsequently filed amended Uniform Commercial Code (UCC) financing statements, in which it confirmed itself as the new administrative agent under the credit agreement and verified its protected security interest in PDM's assets. Through a series of transactions, affiliates of Atlas and a co-investor purchased all of PDM's outstanding debt directly from the lenders for approximately $22 million, which was indicative of the value of PDM's assets.

¶9 PDM, having no prospect of paying back the outstanding debt under the credit agreement, entered into a "transaction support agreement" with Bridge Resources in October 2013. The agreement anticipated that the parties would work towards a strict foreclosure on the collateral securing PDM's loans in exchange for partial satisfaction of PDM's obligations under the 2006 credit agreement. To carry out the strict foreclosure, Atlas created a subsidiary called Veritas, which was assigned a first priority

4

lien on PDM's assets and eventually became the sole secured lender under the credit agreement.[4]

¶10 In November 2013, PDM, Bridge Resources, and Veritas executed a strict foreclosure agreement. PDM conveyed to Veritas the collateral securing the loan in exchange for the discharge of approximately $71 million out of $76 million of unpaid, secured debt that PDM owed under the credit agreement.[5] The strict foreclosure agreement did not change the ownership or board structure of PDM. It is undisputed that there was no stock or other indicia of equitable ownership transferred from Veritas to PDM. Further, no director or owner of PDM became a director or owner of Veritas.

¶11 Meanwhile, in 2010, Lunda, a civil construction contractor, entered into a subcontract with PDM, which required PDM to provide steel for a bridge construction project. In 2012, after PDM failed to perform, Lunda sued for breach of contract. At the time that Veritas foreclosed on PDM's assets, Lunda had a

---

[4] Veritas was formed in October 2013 by Bridge Fabrication Holdings, Veritas's sole member. Bridge Fabrications Holdings and Bridge Resources merged in 2014 and became BFH Holdings, LLC, which is majority-owned by Atlas affiliates.

[5] Pursuant to Uniform Commercial Code § 9-620, a debtor may turn over to a lender the collateral for a loan in exchange for full or partial satisfaction of a debt. Wisconsin's Uniform Commercial Code has a similar provision, see Wis. Stat. § 409.620 (2017-18). There is no dispute that the transaction support agreement and the subsequent strict foreclosure were in full compliance with the procedures set forth in the UCC.

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

contingent, unsecured breach of contract claim. It was not until 2014, <u>after</u> the strict foreclosure agreement was finalized, that Lunda obtained a $16 million judgment against PDM. Lunda, as an unsecured creditor, subsequently took steps under Wis. Stat. § 779.155 to assert a lien on funds owed to Veritas by the Wisconsin Department of Transportation (DOT) for projects on which PDM had worked.

¶12 In February 2015, Veritas commenced this action against Lunda and sought a declaration that Lunda had no claim to payments by the DOT for the projects at issue. Lunda asserted eight counterclaims against Veritas and commenced a third-party action against Atlas, Bridge Fabrication Holdings, and two former officers of PDM.[6] The circuit court granted Veritas's motion to dismiss on six of Lunda's counterclaims. Only two claims remained: a successor liability claim against Veritas[7] and a claim against Veritas, Atlas, and Bridge Fabrication Holdings under the Wisconsin Uniform Fraudulent Transfer Act (WUFTA claim).[8] Summary

---

[6] The two former officers, Alan Sobel and Matthew Cahill, are not involved in this appeal. Cahill, who was the CEO of PDM, and Sobel, who was the CFO of PDM, continued for at least some period of time in those roles at Veritas. However, neither had an owner's interest in PDM or Veritas.

[7] The circuit court had previously dismissed Lunda's successor liability claim against Atlas and Bridge Fabrication Holdings, which is not at issue in this case.

[8] The circuit court had previously granted a separate motion for summary judgment filed by Sobel and Cahill as to Lunda's WUFTA claim.

judgment motions on the remaining two claims were granted by the circuit court.

¶13 On appeal, Lunda challenged the dismissal of its successor liability claim against Veritas under the de facto merger and mere continuation exceptions. Lunda also appealed the dismissal of its WUFTA claim against Veritas and the third-party defendants. The court of appeals affirmed the circuit court as to both issues.[9]

¶14 Lunda petitioned this court for review and challenges the dismissal of its successor liability claim against Veritas as it relates to the de facto and mere continuation exceptions. Lunda also alleges that the court of appeals erroneously dismissed its successor liability claim in light of the fraudulent transaction exception to the rule against successor liability.

## II. STANDARD OF REVIEW

¶15 We review a decision on summary judgment using the same methodology as the circuit court. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 314-15, 401 N.W.2d 816 (1987). Summary judgment shall be granted where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).

## III. ANALYSIS

---

[9] The portion of the court of appeals' decision regarding Lunda's WUFTA claim is not at issue here. See Veritas, No. 2017AP822, ¶¶36-42.

7

¶16 We first discuss the purpose of the general rule against successor liability and the exceptions to that rule as developed in Wisconsin jurisprudence. We next clarify the de facto merger and mere continuation exceptions and determine whether Lunda raised a genuine issue of material fact as to these exceptions. Finally, we decide whether Lunda forfeited its successor liability claim as to the fraudulent transaction exception by failing to raise it before the court of appeals.

### A. The general rule against successor liability: its purpose and relevant exceptions

¶17 It is well established that when a company sells or transfers all of its assets to another company, the purchasing company does not become liable for the transferring company's debts and liabilities. See Fish, 126 Wis. 2d at 298 (quoting Leannais v. Cincinnati, Inc., 565 F.2d 437, 439 (7th Cir. 1977))("'[a] corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation.'"). This general rule against successor liability was designed to protect a bona fide purchaser from assuming the liabilities of a predecessor corporation.[10] See Springer v. Nohl Elec. Prods.

---

[10] Although first applied in the corporate context, we have recognized that the rule against successor liability also belongs in the product liability context because:

> [T]he successor corporation did not create the risk nor did it directly profit from the predecessor's sale of the defective product; it did not solicit the use of the defective product nor make any representations as to its safety; nor is it able to enhance the safety of a product that is already on the market.

<u>Corp.</u>, 2018 WI 48, ¶15, 381 Wis. 2d 438, 912 N.W.2d 1.  "'The traditional rule of nonliability was developed . . . to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor.'"  <u>Fish</u>, 126 Wis. 2d at 303 (quoting <u>Ramirez v. Amsted Indus., Inc.</u>, 431 A.2d 811, 815-16 (N.J. 1981)).

¶18  We have recognized four exceptions to the rule against successor liability under the following circumstances:

> (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

<u>Tift v. Forage King Indus., Inc.</u>, 108 Wis. 2d 72, 75-76, 322 N.W.2d 14 (1982) (quoting <u>Leannais</u>, 565 F.2d at 439).  These exceptions illustrate the balance in successor liability law between "two competing, and often conflicting, policy goals:  to provide a necessary remedy to injured parties, often tort claimants, and to provide transactional clarity and certainty for business parties engaged in fundamental corporate transactions."  Matheson, John H., <u>Successor Liability</u>, 96 Minn. L. Rev. 371, 372-73 (2011).

---

<u>Springer v. Nohl Elec. Prods. Corp.</u>, 2018 WI 48, ¶15, 381 Wis. 2d 438, 912 N.W.2d 1 (quoting <u>Fish v. Amsted Indus., Inc.</u>, 126 Wis. 2d 293, 307, 376 N.W.2d 820 (1985)).

¶19 We focus our discussion on exceptions two and three, also known as the de facto merger and mere continuation exceptions. Both exceptions "are declaratory of tests to be applied to encourage 'piercing the corporate veil'" and thus examine "the substance and effect of business transformations or reorganizations to determine whether the original organization continues to have life or identity in a subsequent and existing business organization." Tift, 108 Wis. 2d at 79. We resolve the parties' dispute over the type of "identity" evidence necessary for purposes of establishing these exceptions.

### B. The de facto merger and mere continuation exceptions defined

¶20 The de facto merger and mere continuation exceptions were defined and then developed in three main cases: Tift, Cody and Fish. This court first explicitly recognized the exceptions in Tift, 108 Wis. 2d 72, a products liability action alleging injuries caused by a "chopper box" tractor attachment. The chopper box was first manufactured by a sole proprietorship, which turned into a partnership and eventually "metamorphosed into" a corporation, Forage King Industries. Id. at 74. Forage King Industries consisted of two shareholders who had formed the partnership, one of whom was the original sole proprietor. Id. Throughout its different business forms, the company retained the same employees, manufactured the same products, and sold to the same dealers. Id. at 74-75.

¶21 In 1975, just before the plaintiff was injured, all of the Forage King Industries stock was purchased by another

10

corporation that continued to operate as Forage King Industries and manufacture the same products. Id. at 75. The plaintiff commenced an action against Forage King Industries and its insurer, alleging that the company was a successor to the manufacturer of the chopper box and was therefore responsible for the plaintiff's injuries. Id.

¶22 We applied the "rules of corporate law" and reasoned that the de facto merger and mere continuation exceptions "demonstrate that, when it is the same business organization that one is dealing with, whether it be by consolidation, merger, or continuation, liability may be enforced" because "[t]hese are tests of identity." Id. at 79. We thus concluded that, despite organizational transformation, the present Forage King Industries was "substantially identical to the organization that manufactured the allegedly defective chopper box and [was] therefore liable."[11] Id. at 80.

¶23 The mere continuation exception to successor liability was further developed in Cody v. Sheboygan Mach. Co., 108 Wis. 2d 105, 321 N.W.2d 142 (1982). The plaintiff sued Sheboygan Machine Company for injuries caused by a defective sander. Id. at 109. The defective sander had been manufactured by the original Sheboygan Machine Company, but that company sold its assets and its name to a different company, who again resold the company

---

[11] The court in Tift did not distinguish between the application of the de facto merger and mere continuation exceptions. See Tift v. Forage King Indus., Inc., 108 Wis. 2d 72, 79-80, 322 N.W.2d 14 (1982).

11

assets and name. Id. at 107-08. The plaintiff brought suit against Sheboygan Machine Company, a corporation that shared the same name as the manufacturer of the sander but functioned exclusively as a repair shop. Id. at 108-09. Sheboygan Machine Company shared none of the officers, directors, or stockholders as the predecessor companies. Id. at 108.

¶24 Citing to the facts of Tift and the principles enunciated in that case, the Cody court concluded that the mere continuation exception did not apply because the facts did "not demonstrate any continuity or identity of business organizations" between the two entities in question. Id. at 106. The Cody court concluded that the second corporation "was an entirely different corporation" and that the "subsequent businesses were markedly different in character and purpose from the original manufacturer" and "were not continuations of the original business." Id. at 111.

¶25 This court refined the de facto merger and mere continuation exceptions several years later in Fish, 126 Wis. 2d 293. The Fish plaintiffs alleged injuries resulting from the use of a power press manufactured by Bontrager Construction Company. Id. at 295-96. The plaintiffs filed suit against Amsted Industries, Inc., the company that acquired Bontrager's assets and continued to make the power press, and South Bend II, the company who subsequently bought the power press line from Amsted. Id. at 295-97. They alleged that, as successor corporations, Amsted and South Bend II were liable for the acts of Bontrager in manufacturing the allegedly defective power press. Id. at 297. All parties agreed that the traditional exceptions to the rule

12

against successor liability did not apply to the case, but the plaintiffs argued that Tift expanded both the de facto merger and mere continuation exceptions. Id. at 298. The plaintiffs argued that "identity" meant "identity of assets, operations and identity of the product, rather than identity of ownership." Id. at 300-01 (emphasis added).

¶26 The Fish court plainly rejected the argument that Tift expanded the de facto and mere continuation exceptions: "the [p]laintiffs are in error in alleging that the Tift decision has expanded the exceptions to the rule of nonliability." Id. at 301. The court specified that "[i]dentity refers to identity of ownership, not identity of product line." Id. The court affirmed dismissal of the successor liability claim as related to both exceptions because "there [was] not sufficient identity between Bontrager and either Amsted or South Bend II to justify holding them liable for the acts of their predecessor." Id. at 295.

¶27 The Fish court also delineated the "key elements" required to meet the de facto and mere continuation exceptions. In determining whether a de facto merger has occurred, the "key element" "is that the transfer of ownership was for stock in the successor corporation rather than cash." Id. at 301. The "key element" to resolve whether the successor is a mere continuation of the seller corporation "'is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.'" Id. at 302 (quoting Leannais, 565 F.2d at 440).

C. The requirement of identity of ownership

13

¶28 As Fish made clear, the de facto and mere continuation exceptions to the rule against successor liability require evidence of identity of ownership.[12] For the de facto merger exception, identity of ownership hinges on whether "the transfer of ownership was for stock in the successor corporation rather than cash." Fish, 126 Wis. 2d at 301. It is important to recognize that transfer of ownership may still exist even where the successor entity does not have stock to offer the acquired entity. In such cases, proof of identity of ownership may be established through equity ownership.[13] For example, equity ownership could take the form of membership interests in a limited liability corporation.[14]

---

[12] As one federal district court correctly noted, "it would appear that the Wisconsin Supreme Court [in Fish] has effectively determined that, absent a transfer of stock ownership, other merger factors are insufficient to sustain application of the de facto merger exception." Smith v. Meadows Mills, Inc., 60 F. Supp. 2d 911, 917 (E.D. Wis. 1999). The Smith court also reflected that, "it appears that the Wisconsin Supreme Court [in Fish] has made one factor——identity of ownership——a necessary requirement for the mere continuation exception to apply." Id. at 918.

[13] Lunda contends that there is "inconsistency" between Wisconsin's statutory merger law, Wis. Stat. § 180.1101, which allows for exchange of shares of one entity for "cash or property" of another, and the stock transfer requirement under the de facto merger exception. As support, Lunda cites to a footnote in the court of appeals' decision. See Veritas, No. 2017AP822, ¶32 n.11. A statutory merger pursuant to § 180.1101 is distinct from a de facto merger in that it involves two companies formally stating their intentions to merge and following statutory procedures to effectuate the merger.

[14] Not all entities will fit within the de facto merger exception. Where there is no ownership interest to be transferred, as in a case involving nonprofit corporations, the de facto merger exception does not apply. As one federal court commented, "[t]he policies underlying the no successor liability principle are geared toward encouraging economic actors to function effectively

14

¶29 As to the mere continuation exception, identity of ownership is established where there "'is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.'" Fish, 126 Wis. 2d at 302 (quoting Leannais, 565 F.2d at 440).[15] Some evidence, like the common identity of stockholders, will support application of both the de facto merger and mere continuation exceptions. However, unlike the de facto merger exception, the mere continuation exception may be established with evidence of the continuation of the same officers, directors, and stockholders under circumstances where there is no transfer of equity or stock ownership.

¶30 Despite Fish's clear mandate that identity of ownership is the key inquiry, Lunda asserts that Fish significantly expanded the de facto merger and mere continuation exceptions to allow the substitution of "identity of management and control" for identity of ownership. In support of its argument, Lunda highlights the Fish court's use of the phrase "identity of management and control" twice in the decision: once, in addressing Tift, where the court said there was an "identity of management and control throughout the transformation from sole proprietorship to partnership;" and again, in discussing Cody, where the court said there was "no

in a market economy and have no application in the context of non-profit and non-stock organizations." Gallenberg Equip., Inc. v. Agromac Int'l, Inc., 10 F. Supp. 2d 1050, 1056 (E.D. Wis. 1998).

[15] Tift and Fish relied upon Leannais v. Cincinnati, Inc., 565 F.2d 437 (7th Cir. 1977), for the basic principles regarding successor liability. See Veritas, No. 2017AP822, ¶24 n.8 (describing the Leannais case).

15

identity of management and control throughout the transfers of ownership." Fish, 126 Wis. 2d at 302. Lunda further cites to IGL and Gallenberg for the proposition that courts post-Fish have not required identity of ownership. IGL-Wis. Awning, Tent & Trailer Co., Inc. v. Greater Milwaukee Air & Water Show, Inc., 185 Wis. 2d 864, 520 N.W.2d 279 (Ct. App. 1994); Gallenberg Equip., Inc. v. Agromac Int'l, Inc., 10 F. Supp. 2d 1050 (E.D. Wis. 1998).

¶31 Identity of ownership remains the sine qua non of successor liability. Although the phrase "identity of management and control" was used to describe the transfers of ownership in Tift and Cody, the Fish court maintained that identity of ownership is required to meet the de facto merger and mere continuation exceptions. The Fish court explained that in Tift there was identity of ownership because "the identical organization continued to manufacture the same product" and in Cody there was not identity of ownership because "the successor corporation was an entirely different corporation" with "'no common identity of officers, directors and stockholders between the two companies.'" Fish, 126 Wis. 2d at 300, 302 (quoted source omitted).

¶32 Contrary to Lunda's assertion, courts post-Fish have required proof of identity of ownership to establish the de facto merger and mere continuation exceptions. Lunda contends that the IGL court "impos[ed] successor liability based on a finding that there was 'identity of management and control' of two corporations." However, in concluding that the mere continuation exception applied, the court of appeals in IGL relied upon the circuit court's finding of fact that "'[f]or all intents and

16

purposes, only the name of the business changed.'" IGL, 185 Wis. 2d at 870.[16] The IGL court additionally relied upon the circuit court's finding of fact that "[t]he identical organization in substance continued to operate with the same persons . . ." including the same director who formed the predecessor nonprofit corporation. Id. at 868, 870.

¶33 Similarly, in Gallenberg, the federal court rejected the plaintiff's successor liability claim because the "plaintiff cannot show continuity of ownership," which it described as "the common thread" of the de facto merger and mere continuation exceptions. Gallenberg, 10 F. Supp. 2d at 1054. The court refused to consider the argument that by actively managing the predecessor corporation for a time period before the asset purchase, the successor corporation's owners were "de facto shareholders" and exercised pre-transfer control. Id. at 1056. The Gallenberg court concluded that the plaintiff wrongly "equate[d] control with ownership. They are not the same." Id. Both IGL and Gallenberg thus required evidence of identity of ownership in order to meet the relevant exceptions to successor liability at issue in each case.

---

[16] The mere continuation exception was the only exception to the general rule against successor liability that was addressed by the court in IGL-Wis. Awning, Tent & Trailer Co., Inc. v. Greater Milwaukee Air & Water Show, Inc., 185 Wis. 2d 864, 520 N.W.2d 279 (Ct. App. 1994).

17

¶34 We reject Lunda's reading of Tift and Fish[17] and decline to broaden the exceptions to the rule against successor liability, as we have declined to do in the past. See Fish, 126 Wis. 2d at 303-12 (rejecting the plaintiff's arguments in favor of adopting a "product line" exception and "expanded continuation" exception to the rule).[18] Identity of ownership, not identity of management and control, remains the essential element that a plaintiff must establish under both the de facto merger and mere continuation exceptions.

### D. No genuine issue of material fact regarding identity of ownership

¶35 The facts in this case do not establish identity of ownership between Veritas, the asset purchaser, and PDM, the seller, under either the de facto merger or mere continuation exceptions. In regards to the de facto merger exception, it is undisputed that there was no stock or other indicia of equity ownership transferred from Veritas to PDM. Therefore, there was no de facto merger as a matter of law and Lunda's claim under this exception must fail.

¶36 As to the mere continuation exception, Atlas and its subsidiaries, including Veritas, were strangers to Lunda prior to

---

[17] Lunda does not dispute that we must affirm the court of appeals if we reject its interpretation of Fish, 126 Wis. 2d 293.

[18] Expanding the exceptions to the rule against successor liability would also be inconsistent with its important objective: to provide "transactional clarity and certainty for business parties engaged in fundamental corporate transactions." Matheson, John H., Successor Liability, 96 Minn. L. Rev. 371, 373 (2011).

18

receiving a call from an investment banker regarding the prospect of purchasing PDM. Veritas and PDM had separate and distinct ownership before <u>and</u> after Veritas foreclosed on PDM's assets. No director or owner of PDM became a director or owner of Veritas. Based on this lack of common identity of officers, directors, and stockholders in the selling and purchasing corporations, the mere continuation exception does not apply.

¶37 Lunda has not raised a genuine issue of material fact as to identity of ownership under either the de facto merger or mere continuation exceptions and therefore its successor liability claim must fail.

E. Forfeiture of Lunda's successor liability claim based upon the fraudulent transaction exception

¶38 Finally, Lunda asserts that the court of appeals erroneously dismissed its successor liability claim in light of the fraudulent transaction exception to the rule against successor liability.[19] Veritas contends that Lunda forfeited this argument when it failed to raise the exception before the court of appeals.[20] We agree.

---

[19] In its third-party complaint, Lunda referred to the exception as the "fraudulent purpose exception." It has also been referred to as the "fraudulent transfer exception" and the "fraudulent transaction exception." Like we did in <u>Springer</u>, 381 Wis. 2d 438, we will refer to it as the fraudulent transaction exception so as to not mistake it for the WUFTA claim.

[20] Veritas also contends that Lunda never pursued this exception before the circuit court on summary judgment; however, as detailed herein, that is inaccurate.

¶39 A chronological summary of the circuit court proceedings and subsequent appellate briefing illustrates how Lunda forfeited this argument. When Lunda filed its counterclaims and third-party complaint in response to Veritas's declaratory judgment action, it asserted a successor liability claim based on three exceptions to the rule against successor liability: de facto merger, mere continuation, and fraudulent transaction. At the same time, Lunda also pleaded a statutory WUFTA claim. Lunda's brief in opposition to Veritas's motion for summary judgment included argument on only the de facto merger and mere continuation exceptions, and its WUFTA claim. But, at oral argument before the circuit court, the fraudulent transaction exception was raised and both parties confirmed its existence within the dispute. The circuit court's final order explained that it found no genuine issue of material fact as to successor liability "under any of the theories that Lunda advanced, whether de facto merger, mere continuation, or fraudulent [transaction]," and that it also found no dispute as to Lunda's WUFTA claim. (Emphasis added.)

¶40 In its brief to the court of appeals, Lunda chose not to raise an argument as to the circuit court's adverse ruling on the fraudulent transaction exception. Instead, Lunda argued that there were "genuine issues of material fact as to the elements of the de facto merger and mere continuation" exceptions, and as to its WUFTA claim.

¶41 Lunda suggests that this court's recent decision in Springer, 381 Wis. 2d 438, revives its claim for successor liability on the basis of the fraudulent transaction exception.

20

In Springer, we concluded that a fraudulent transfer under WUFTA did not supplant the common-law fraudulent transaction exception to the rule against successor liability. Id., ¶29.

¶42 The court of appeals reached its decision in this case in November 2018, several months after publication of Springer, and addressed the only issue related to fraudulence that was presented by Lunda: its WUFTA claim. See Veritas, No. 2017AP822, ¶¶36-42. Because Lunda failed to pursue the fraudulent transaction exception on appeal, the holding in Springer is of no import. Lunda failed to preserve on appeal its successor liability claim as to the fraudulent transaction exception and this court's decision in Springer cannot revive it. We decline to address this forfeited claim.

## IV. CONCLUSION

¶43 We conclude that because Lunda did not establish a genuine issue of material fact as to identity of ownership between Veritas and PDM, it cannot satisfy the de facto merger or mere continuation exceptions to the rule against successor liability. We further conclude that by not raising the fraudulent transaction exception before the court of appeals, Lunda forfeited its claim for successor liability based on that exception. We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

21

¶44 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring).* There is no question of fact that Atlas's related entities purchased PDM Bridge, LLC's (PDM)[1] secured debt from PDM's lenders with the intent to obtain control of PDM. They did so through strict foreclosure of that secured debt, which resulted in ownership of PDM's assets without encumbrance by any debt with lower priority than the secured debt that drove the foreclosure.

¶45 Lunda Construction Company (Lunda) asserts that the strict foreclosure does not save Veritas's assets from its $16 million judgment against PDM. Before us, Lunda contends that Veritas is the same corporation as PDM, but with a different name, due to de facto merger and mere continuation doctrines. Lunda also asserts that Veritas's intent to remove PDM's assets from its reach gives rise to common law and statutory fraud claims that open Veritas's assets to collection for Lunda's judgment against PDM.

¶46 Therefore, the question before us is whether, given the undisputed facts, Atlas lawfully removed PDM's assets from Lunda's reach by the actions it and its affiliates took, which actions culminated in strict foreclosure that prevented Lunda's claims from reaching Veritas's assets. As I explain below, my answer to that question is yes. Accordingly, although I do not join the majority opinion, I respectfully concur in the majority opinion's dismissal of Lunda's claims against Veritas.

---

[1] PDM was a non-stock Delaware corporation with a single member, ASP PDM, LLC (ASP), which also was a non-stock Delaware corporation.

I.  BACKGROUND

¶47  PDM was a steel bridge fabrication company with offices in Illinois and fabrication facilities in Wisconsin and Florida. In 2006, to continue in business, PDM obtained financing from a syndicate of lenders (the Syndicate), which provided PDM loans evidenced by a $115 million note and a $25 million line of credit. The Syndicate collateralized its loans with PDM's real estate and personal property, both tangible and intangible, by filing appropriate mortgages and financing statements to protect its interests.  ASP also pledged its member interest in PDM to the Syndicate thereby giving corporate control of PDM to the Syndicate.

¶48  PDM's financial difficulties continued.  In December of 2011, PDM suffered losses in excess of $63 million and was in default of its financial commitments to the Syndicate.  The Syndicate and PDM entered into a Forbearance Agreement, wherein PDM agreed to "restructure" its operations.

¶49  In 2012, PDM's financial troubles continued, producing another loss in excess of $63 million.  Its financial difficulties also were affecting Lunda.  In July of 2012, Lunda sued PDM for breach of contract with damages alleged to be in excess of $16 million.[2]

¶50  Notwithstanding the 2011 "restructuring," PDM continued to have general financial difficulties.  PDM also was unable to meet the terms of the 2011 Forbearance Agreement between it and the Syndicate.

---

[2] Due to a series of intervening events, Lunda did not obtain a judgment on this debt until 2014.

¶51 In June of 2013, the principal amount of PDM's debt to the Syndicate was approximately $70 million and PDM was insolvent. PDM was in default of its credit agreement with the Syndicate. Due to PDM's financial condition, the Syndicate and PDM entered into a second Forbearance Agreement[3] wherein PDM became obligated to retain assistance of an investment banker to sell its business as a going concern or to sell all of its assets on or before September 20, 2013.

¶52 To accomplish those tasks, PDM retained Houlihan Lokey Capital, Inc., a well known investment banker with experience selling distressed companies. Although the investment banker contacted 136 potential purchasers, only six letters of interest were obtained. No responding entity was willing to pay enough to cover the Syndicate's outstanding $70 million debt. Atlas, a private equity firm and industrial holding company, was the highest bidder, offering $33 million as a net purchase price for PDM.

¶53 Upon learning that Lokey's efforts to sell PDM had not been successful, Atlas, and two other unsuccessful bidders in the potential sale of PDM, offered to purchase the Syndicate's secured debt for varying amounts. Atlas did so because it determined that if properly restructured, PDM could be a valuable asset for Atlas's investors.

¶54 In August 2013, Atlas created Bridge Resources, LLC (Bridge Resources), with Atlas as its majority member. Bridge Resources and another Atlas entity, paid the Syndicate

---

[3] There is no evidence that Veritas, Atlas and Bridge Fabrications Holdings, LLC (BFH) were parties to the Forbearance Agreement or had an interest in PDM's debt or equity at the time the Forbearance Agreement was executed.

3

approximately $22 million for all of the Syndicate's secured debt and the ASP pledge. Bridge Resources became the administrative agent of the secured debt. Appropriate financing statements and mortgages were filed on all of PDM's personal and real property, giving Bridge Resources a perfected security interest in all PDM's assets.

¶55 In September 2013, Bridge Resources created Bridge Fabrications Holdings, LLC (BFH).[4] In October of 2013, to accomplish strict foreclosure of PDM's assets, BFH created Veritas Steel, LLC (Veritas) to which rights in PDM's secured debt were transferred.[5]

¶56 On November 5, 2013, Veritas conducted a Wis. Stat. § 409.620 strict foreclosure procedure on all the secured debt via a Strict Foreclosure Agreement. In that Agreement, Veritas agreed to assume only those PDM liabilities that were expressly set forth in the agreement.

¶57 Strict foreclosures on the secured debt permitted Veritas to own all PDM assets in satisfaction of the debt that PDM had originally incurred during the Syndicate financing.[6] At the

---

[4] BFH's members were Lapetus Capital LLC, Atlas Resources, LP and SHP; Capital Solutions Fund, LP and Atlas Capital Resources, LP.

[5] BFH was Veritas's sole member. In October of 2013, BFH created BFH Secured Lending and was its sole member; then in December of 2013, Bridge Resources merged into BFH.

[6] Pursuant to Wis. Stat. § 409.620 (U.C.C. § 9-620) a creditor can foreclose on debt collateralized by personal property of a type that is subject to Wis. Stat. ch. 409 (U.C.C. ch. 9) and accept the collateral in full or partial satisfaction of the debt.

Foreclosures of PDM's real property proceeded under differing statutory provisions depending on the location of the real

4

conclusion of strict foreclosure, Veritas owned all of PDM's assets, cleansed of all secured and unsecured debts that were subordinate to the secured debt that Veritas owned.

¶58 In March of 2014, Lunda obtained a judgment of approximately $16 million against PDM, which it filed in Wisconsin in July of 2014 and in Illinois in September of 2014. In July of 2014, Lunda commenced an action in Wisconsin to obtain funds from the Wisconsin Department of Transportation (DOT) pursuant to Wis. Stat. § 779.155 based on its judgment against PDM.[7]

¶59 In February 2015, Veritas commenced this lawsuit as a declaratory judgment action due to Lunda's Wis. Stat. § 779.155 action seeking payments from DOT, which Veritas claimed belonged to it. Lunda counterclaimed, alleging that Veritas was PDM by another name; and therefore, Veritas's assets were subject to Lunda's claims for payment of its $16 million judgment against PDM.

¶60 Lunda contended that Veritas is the same entity as PDM due to a de facto merger of PDM, or as a mere continuation of PDM. Lunda also asserted that the strict foreclosure procedures employed were grounded in common law or statutory fraud and therefore, permit Lunda to collect its debt from Veritas's assets. The circuit court dismissed Lunda's complaint against Veritas, and the court of appeals affirmed that dismissal.

## II. DISCUSSION

### A. Standard of Review

---

property. See Wis. Stat. § 846.15 et seq.

[7] PDM was dissolved in August of 2014.

5

¶61 Here, we review summary judgment granted to Veritas. In so doing, we independently employ the same methodology as the court of appeals and the circuit court. Wisconsin Pharmacal Co., LLC v. Nebraska Cultures of Cal., Inc., 2016 WI 14, ¶12, 367 Wis. 2d 221, 876 N.W.2d 72. Summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting Wis. Stat. § 802.08(2) (2013-14)).

## B. Corporate Assets

### 1. General Rule

¶62 When one corporation buys the assets of another corporation in a commercial context, the transferee corporation generally does not succeed to the transferor's debts. Marie T. Reilly, Making Sense of Successor Liability, 31 Hofstra L. Rev. 745 (2003). However, a court may decide that the transferee corporation should be treated as a successor corporation and be liable for the transferor's debts. Id. at 746. In the matter before us, strict foreclosure, a Wis. Stat. § 409.620, et seq. remedy available to secured creditors, is the context in which to evaluate Lunda's claims.[8]

---

[8] There are occasions when federal law causes the purchasing corporation to be liable for the acts of the transferor corporation. See Kathryn A. Barnard, EPA's Policy of Corporate Successor Liability Under CERCLA, 6 Stan. Envtl. L. J. 78 (1986-1987). CERCLA and its policy concerns are not present here. I mention CERCLA only because the context in which successor corporate liability is evaluated is important.

¶63 Wisconsin follows the general rule, wherein a corporation that purchases the assets of another corporation in a commercial context is not liable for the obligations of the selling corporation. See Fish v. Amsted Indus., Inc., 126 Wis. 2d 293, 298, 376 N.W.2d 820 (1985). The general rule stated above promotes alienability of corporate assets and is in accord with policies that promote productive use of business assets. Gallenberg Equip., Inc. v. Agromac Int'l, Inc., 10 F. Supp. 2d 1050, 1053 (1998).

## 2. Exceptions

¶64 In Wisconsin, there are four exceptions to the rule of non-liability for the transferee corporation:

> (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

Fish, 126 Wis. 2d at 298 (quoting Leannais v. Cincinnati, Inc., 565 F.2d 437, 439 (7th Cir. 1977)).

¶65 Lunda contends that the strict foreclosure employed here caused a de facto merger between PDM and Veritas. In evaluating a claim of de facto merger, appellate precedent considers whether:

> (1) the assets of the seller corporation are acquired with shares of the stock in the buyer corporation, resulting in a continuity of shareholders; (2) the seller ceases operations and dissolves soon after the sale; (3) the buyer continues the enterprise of the seller corporation so that there is a continuity of management, employees, business location, assets and general business operations; and (4) the buyer assumes those liabilities of the seller necessary for the uninterrupted continuation of normal business operations.

Sedbrook v. Zimmerman Design Grp., Ltd., 190 Wis. 2d 14, 20-21, 526 N.W.2d 758 (Ct. App. 1994) (quoting Parson v. Roper Whitney, Inc., 586 F. Supp. 1447, 1449 (W.D. Wis. 1984)). However, as we explained in Fish, "[t]he key element in determining whether a merger or de facto merger has occurred is that the transfer of ownership was for stock in the successor corporation rather than cash." Fish, 126 Wis. 2d at 301 (quoting Leannais, 565 F.2d at 439).

¶66 In the matter before us, Lunda has provided nothing from which we could conclude that PDM's member, ASP, received membership status in Veritas, upon foreclosure, at the time of asset transfer or at any other time. The assets of PDM were obtained in exchange for satisfaction of approximately $65 million of PDM's $70 million of secured debt, which Veritas then held.[9] Veritas's position relative to the assets that belonged to PDM did not arise due to a merger or a de facto merger of PDM with Veritas.

¶67 Lunda also contends that Veritas is a mere continuation of PDM; that it is the same corporation, but with a different name. In evaluating a claim that one corporation is a mere continuation of an earlier corporation, we consider whether there is "a common identity of the officers, directors and stockholders in the selling and purchasing corporations." Leannais, 565 F.2d at 440. In Tift, we cited Leannais and also focused on "identity." As we explained:

> When viewed in the context of a tort caused by a defective product, these two "exceptions" merely recite that, where either one is applicable, there is "identity," because in substance the successor business

---

[9] Five million dollars of secured debt remained and was retained by Veritas together with the assets that secured it.

8

organization which the plaintiff sues is, despite organizational metamorphosis, the same business organization which manufactured the product which caused his injury.

Tift v. Forage King Indus., Inc., 108 Wis. 2d 72, 78, 322 N.W.2d 14 (1982). Our major concern in Tift was whether a company that began as a sole proprietorship, proceeded to a partnership and ended as a corporation could be liable for a product manufactured by an earlier business form that was not corporate. Id. at 76-77. However, lest there be confusion on the meaning of "identity," in Fish, we explained that "[i]dentity refers to identity of ownership, not identity of product line." Fish, 126 Wis. 2d at 301.

¶68 In the matter before us, there is no identity of ownership between PDM and Veritas. Both PDM and Veritas have LLC non-stock structures, but there was no overlap in their members or in their creators. PDM, a Delaware LLC, had a single member, ASP. Veritas, also a Delaware limited liability company, has a single member, BFH. BFH's members do not include ASP or PDM. While non-stock corporations generally are controlled by their articles and owned by their members, the articles of neither PDM nor Veritas are in the record before us. There is no proof in the record that supports the conclusion that Veritas and PDM have the same ownership. While it appears that Matt Cahill,[10] who was the CEO of PDM, and Alan Sobel, who was the CFO of PDM, continued for at least some period of time in those roles at Veritas, neither had an owner's interest PDM or in Veritas. Accordingly, Veritas does

---

[10] Cahill was replaced as CEO in April of 2014.

not meet the criteria necessary for us to conclude that it is a mere continuation of PDM.

¶69 Lunda also contends that because Veritas foreclosed by using strict foreclosure procedures that were designed to eliminate all debt that had a lesser priority than the debt Atlas affiliates purchased from the Syndicate, the transactions at issue here were fraudulent as to Lunda.[11] Therefore, Lunda reasons the general rule that the purchasing corporation is not responsible for the debts of the seller does not apply; and accordingly, it has the right to execute its $16 million judgment against Veritas's assets.

¶70 The elements of common law fraud are: (1) a representation of fact that the speaker intends the hearer to rely on; (2) which the speaker either knows is untrue, or makes with reckless disregard for its truthfulness; (3) another believes such representation and relies on it; (4) with resulting damage. Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 25, 288 N.W.2d 95 (1980) (quoting Whipp v. Iverson, 43 Wis. 2d 166, 169-170, 168 N.W.2d 201 (1969)).

---

[11] Lunda pled common law fraud and the circuit court addressed it. Lunda also raised it in its arguments before us. The majority opinion applies forfeiture and does not address this contention because Lunda did not continue this allegation before the court of appeals. Majority op., ¶¶38-42.

Forfeiture is a doctrine of judicial administration. See State v. Soto, 2012 WI 93, ¶¶35, 36, 343 Wis. 2d 43, 817 N.W.2d 848. Because Lunda's contention arises in a commercial context where statutory procedures under ch. 409 were employed and guidance may be helpful to future commercial litigants, I choose to address Lunda's contention.

10

¶71 We recently addressed common law fraud in Springer v. Nohl Elec. Prods. Corp., 2018 WI 48, 381 Wis. 2d 438, 912 N.W.2d 1, in the context of a products liability claim that alleged successor corporation liability. There, Mrs. Springer claimed that her husband died from exposure to asbestos-containing products, which occurred during his employment for a company that preceded Nohl. Id., ¶2. She sued Nohl to recover for his injuries and death. Id. We explained that the fraudulent transfer of assets exception to non-liability "has rarely been used to impose successor liability for products liability claims." Id., ¶17 (citing Restatement (Third) of Torts: Products Liability § 12 cmt. e (Am. Law Inst. 1998); Timothy J. Murphy, A Policy Analysis of a Successor Corporation's Liability for Its Predecessor's Defective Products When the Successor Has Acquired the Predecessor's Assets for Cash, 71 Marq. L. Rev. 815, 819 (1988).

¶72 In Springer, we painted the fraud exception with broad strokes that left the particulars of that exception for another day. We said, "The fraudulent transaction theory turns on the intention underlying the transfer of assets to [the successor], i.e., whether it was made with an actual intention to hinder, delay, or defraud creditors." Springer, 381 Wis. 2d 438, ¶19 (quoting United States ex rel. Bunk v. Gov't Logistics N.V., 842 F.3d 261, 276 (4th Cir. 2016)). We also said that "the fraudulent transfer exception, [in] the law [of] every jurisdiction . . . requires a finding that the corporate transfer of assets 'is for the fraudulent purpose of escaping liability.'" Id. (quoting Raytech Corp. v. White, 54 F.3d 187, 192 (3d Cir. 1995) (alterations in original)). The wrongful intent of the

11

person seeking to avoid liability was critical to our decision in Springer. Id., ¶19.

¶73 It is important to note that Springer arose in the context of a products liability claim. It did not involve strict foreclosure of secured debt pursuant to Wis. Stat. § 409.620. Lunda gave little attention to the commercial context in which its claim arose, yet an understanding of the context in which Lunda makes its claim and Veritas raises its defense is critical. Therefore, a brief overview of strict foreclosure will be helpful to the reader's understanding of my discussion that follows.

¶74 "Article 9 of the Uniform Commercial Code (U.C.C.) permits a secured creditor to elect among several alternative remedies in the event of a default by the debtor."[12] LaRoche v. Amoskeag Bank, 969 F.2d 1299, 1302 (1st Cir. 1992). Subsequent to debtor default, the secured creditor may dispose of the collateral, "as long as it does it in a 'commercially reasonable manner.'" Id. at 1303. However, a secured creditor also may choose to proceed by strict foreclosure, which is a different statutory opportunity. Id.

¶75 Strict foreclosure permits a secured creditor "to retain the collateral in complete satisfaction of the indebtedness." Id. "Disputes about valuation or even a clear excess of collateral value over the amount of obligations satisfied do not necessarily demonstrate the absence of good faith." Michael L. Monson, Strict Foreclosure Under Article 9: Benefits, Risks, and Strategies, 43 No. 1 UCC L.J. (Oct. 2010), 3.

---

[12] Wisconsin Stat. ch. 409 is the Wisconsin equivalent of Uniform Commercial Code chapter 9.

12

¶76 When a secured party employs strict foreclosure pursuant to statute and accepts the collateral in full or partial satisfaction of the debt owed:

> (1) the debt is discharged to the extent consented to by the debtor, (2) all of the debtor's rights in the collateral are transferred to the secured party, (3) the security interest that was the subject of the debtor's consent and any subordinate security interest or other subordinate liens are discharged, and (4) any other subordinate interests are terminated. . . . After the secured party has accepted the collateral it may resell the collateral to a subsequent purchaser, keep it, or otherwise deal with it as its own property.

Id. at 6.

¶77 Wisconsin Stat. § 409.620's authorization of strict foreclosure has a number of mandatory procedures and the availability of objections that could stop the process. For example, subordinate secured creditors have a right to notice of the proposed strict foreclosure, Wis. Stat. § 409.621(1), and a right to object to using strict foreclosure, Wis. Stat. § 409.620(1)(b). However, on November 5, 2013, when Veritas strictly foreclosed on the debt that was secured by PDM's assets, Lunda was not a subordinate secured creditor. Therefore, Lunda did not have the opportunity to object to Veritas' use of strict foreclosure.

¶78 In addition, Lunda has not claimed that the strict foreclosure that occurred here did not satisfy the statutory obligations of Wis. Stat. ch. 409. Lunda simply contends that because the strict foreclosure process was used to cleanse assets of debt the process was fraudulent.

¶79 Lunda's argument misses its mark because Wis. Stat. ch. 409 was created in part to do exactly what happened

13

here. Veritas's conduct was not fraudulent because it was not wrongful in this commercial context.[13] Stated otherwise, I conclude that a creditor that strictly forecloses in a commercial context in accord with the statutory procedures set out in ch. 409 to avoid the claims of debtors with lesser priority does not exhibit wrongful intent that supports a claim of common law fraud. Accordingly, the broad statements about "fraudulent intent" set out in Springer have no application here.

¶80 My conclusion that strict foreclosure under Wis. Stat. § 409.620 does not support Lunda's fraud claim is reinforced by Wis. Stat. § 242.08(5)(b). Statutory fraud, Wisconsin Uniform Fraudulent Transfer Act (WUFTA), is set out in Wis. Stat. ch. 242. Lunda sought to use WUFTA to void the transfer of PDM's assets to Veritas. However, § 242.08(5)(b) provides that a transfer is not voidable if it results from "Enforcement of a security interest in compliance with ch. 409." Here, there is no question that the transfer of personal property, tangible and intangible, occurred through enforcement of a security interest under § 409.620 et seq. WUFTA also has no application here.

---

[13] Chapter 409's legislation for secured transactions is complicated. An understanding of the claim and defense and the context in which they arise is critical. Here, we have strict foreclosure between commercial parties engaged in commercial transactions.

14

### III.  CONCLUSION

¶81  The question before us is whether, given the undisputed facts, Atlas lawfully removed PDM's assets from Lunda's reach by the actions it and its affiliates took, which actions culminated in strict foreclosure that prevented Lunda's claims from reaching Veritas's assets.  As I explained above, my answer to that question is yes.  Accordingly, although I do not join the majority opinion, I respectfully concur in the majority opinion's dismissal of Lunda's claims against Veritas.